Third Division 

May 14, 2003 

No. 1-00-1483 

THE PEOPLE OF THE STATE ) Appeal from the

OF ILLINOIS, ) Circuit Court of

) Cook County 

Plaintiff-Appellee, ) 

)

v. ) No. 98 CR 9406(02) 

) ANTHONY ROSEMOND,                    ) Honorable 

) Stanley J. Sacks,

Defendant-Appellant.   ) Judge Presiding.

JUSTICE HALL delivered the opinion of the court:

Defendant, Anthony Rosemond, was charged by information with first-degree murder, aggravated arson and intimidation.  Codefendant Christopher Mosely was tried separately and is not a party to this appeal.  A third codefendant, 13-year-old Matthew Wilson, was also charged with these offenses.  Following a joint transfer hearing, the trial court ruled that Wilson would remain in juvenile court, while defendant, who was 14 years old, would be tried as an adult.

Following a jury trial, defendant was found guilty of first-degree murder and aggravated arson.  On April 18, 2000, he was sentenced to concurrent terms of 26 years' imprisonment for first-degree murder and 10 years' imprisonment for aggravated arson.  On the same date, defendant filed his timely notice of appeal.

On appeal, defendant contends that: (1) the trial court erred in admitting the polygraph evidence; and (2) he was denied his sixth amendment right to effective assistance of counsel.  For the reasons that follow, we reverse and remand.

FACTUAL BACKGROUND

Defendant's conviction arose from the death of Zulean Wilson, who died of smoke inhalation resulting from a fire that was set in a three-story building she lived in, located at 7108 S. Rhodes Avenue, Chicago, Illinois.  The fire, which was ruled an arson, occurred on August 15, 1997, at approximately 10 p.m.

Prior to trial, the trial court denied defendant's motion to suppress oral and written statements he gave during his police interrogation the day after the fire.  In addition, just prior to opening statements, the trial court heard arguments on the State's motion 
in limine
 to admit gang evidence.  The State claimed that defendant's written statement indicated that codefendants Mosely and Wilson were members of the Gangster Disciples street gang and that the building was set afire to retaliate against Marlo Fernando, a resident of the building, who repeatedly called the police to report the gang's drug-selling activities that occurred outside the building.  According to the State's offer of proof, Fernando would testify that defendant is a member of the Gangster Disciples (GDs) and that the defendant, along with codefendant Mosely, regularly sold illegal narcotics outside the building.

The trial court ruled that evidence that defendant was affiliated with the GDs would be admissible to establish his motive for following Mosely's demand to set fire to the building.  The trial court also ruled that evidence of illegal narcotics sales was admissible as a possible motive, if the State proved that defendant was selling narcotics outside the building or was in the company of Mosely when he sold illegal narcotics.  In addition, the trial court granted the State's request to admit threatening statements Mosely made to Fernando immediately before and just after the fire was set.  The statements were admitted under the coconspirator exception to the hearsay rule.

At trial, the State's evidence established that the three-story building that was set afire had stores on the first floor and apartments on the second and third floors.  State witness Fernando, who lived in a second-floor apartment, testified that approximately two weeks before the fire, some of Mosely's fellow gang members intentionally broke a window of her parked car.  When the gang members refused to pay for the window, as Mosely had promised, Fernando began calling the police whenever she saw gang members selling drugs outside her building.

Fernando testified that on the night of the fire, she was in her apartment talking to her friend Leila Ledbetter when she heard, through her open window, a voice she recognized as Mosely's yell three times, "burn this motherf---er down."  Fernando looked out her window and saw Mosely standing on the sidewalk under the window.  Fernando then opened her front door, which was secured by accordion-type security bars, and saw defendant and Wilson running past the door and down a smoke-filled hallway.  Fernando and Ledbetter left the building and exited into an alley.

Fernando testified that when she reached the alley, she saw Wilson standing in the alley laughing.  Fernando and Ledbetter went back inside the building to help a woman and her child escape from the building.  Fernando testified that when she returned to the alley, Mosely approached and told her that the fire was a GD hit, called her a "b---h," and threatened her life.  Fernando testified that after she informed a fireman about Mosely's remarks, the fireman passed the information on to a policeman on the scene, and the policeman took Fernando's name and told her that she would be contacted.

State witness Sergeant Peggy Johnson, an investigator for the Chicago police department's arson investigation unit, testified that based on her interviews with Fernando and Ledbetter, which occurred the day after the fire, she traveled to defendant's home in order to bring him into the police station for questioning regarding the fire.  Johnson and a detective transported defendant to police headquarters.  Defendant's father, James Rosemond, followed in his own vehicle.

Johnson testified that once they arrived at the police station, defendant was taken to a room in the arson unit and read his 
Miranda
 rights.  James Rosemond arrived about 10 minutes later and defendant was again read his rights in front of his father.  At approximately 10:30 a.m., Johnson began questioning defendant about the circumstances surrounding the fire.  Defendant's father and homicide detective Paul Bernatek were both present in the interview room during this questioning.  Johnson testified that she asked defendant what his involvement was with the fire and informed him that witnesses had implicated him.  Defendant responded that he knew nothing about the fire.

Johnson testified that she continued to speak with defendant and his father intermittently from about 10:30 a.m. to 3:30 p.m.  At 3:30 p.m., defendant and his father were taken to a second investigative unit.  About 30 minutes later, Johnson received word to come to the second investigative unit and get defendant and his father.  Defendant and his father were then brought back to the arson unit whereupon Johnson explained to them what the "results were."
(footnote: 1)  Defendant and his father were then left alone for approximately half an hour.  When the interviewing resumed, defendant admitted his involvement with the fire.  Defendant's admission occurred at about 4:30 p.m. or 5 p.m.  Johnson testified that she then contacted the State's Attorney's office.

Johnson testified that Assistant State's Attorney (ASA) Paul Pavlus arrived at the police station at about 6:30 p.m., as did youth officer Golden.  At approximately 7 p.m., in front of Johnson, Detective Bernatek, youth officer Golden, ASA Pavlus, and his father, defendant again confessed to his involvement in the fire.  Johnson testified that defendant stated that he and Wilson retrieved a gas can that was nearly full of gas and used the gas to set the building on fire.  Defendant stated that he acted as lookout and that the fire was a GD hit and was set to retaliate against one of the tenants in the building.  Defendant's father left the police station at about 9:30 p.m., and defendant's statement was reduced to writing at approximately 11 p.m.

On cross-examination, Johnson acknowledged that defendant's statement was reduced to writing after defendant's father left the police station.  She testified that defendant's statement was reduced to writing at that time because ASA Pavlus interviewed other individuals before writing out defendant's statement. 

After Johnson finished testifying, a sidebar was held at the prosecutor’s request.  During the sidebar, the prosecutor argued that the tenor of defense counsel's cross-examination of Johnson left the impression that defendant's confession resulted from the duration of the interrogation and the fact that his father left the police station and not from the fact that defendant confessed after being confronted with the results of his polygraph test.  The prosecutor argued that he should therefore be allowed to rebut this impression and explain to jurors the real reason defendant gave the statement.  The trial court responded that the prosecutor could bring up the issue in rebuttal if the defendant testified or if "it's brought out through the questioning of the father in some fashion if the father testifies."

ASA Pavlus testified that he interviewed defendant sometime between 7:30 p.m. and 8 p.m.  Defendant was with his father.  Also present were Johnson, Detective Bernatek, and youth officer Golden.  After defendant waived his rights, he gave an oral statement regarding his involvement with the fire.  ASA Pavlus testified that before defendant's statement was reduced to writing, he asked defendant how he had been treated by the police.  ASA Pavlus asked defendant this question in the presence of defendant's father and a second time out of the father's presence.  On both occasions defendant stated that he had been treated fine.  Defendant stated that he had been given something to eat and drink, and that he was not threatened or promised anything in exchange for his statement.  Defendant also stated that his father did not pressure him into making the statement.  ASA Pavlus testified that he spoke with defendant's father alone outside the interview room and asked him how the police had treated his son.  James Rosemond responded that his son had been treated fine.

ASA Pavlus testified that from 9 p.m. to 11 p.m., he interviewed various witnesses as well as two individuals who might have participated in the arson.  Afterwards, he took defendant's written statement at about 11 p.m.  Defendant signed the statement and initialed changes made to the statement.  The written statement was read to the jury.

On cross-examination, ASA Pavlus testified that when he received information that James Rosemond was planning to leave the police station, he tried to convince Rosemond to stay at the station.  ASA Pavlus testified that he informed Rosemond that he was going to take his son's written statement and that it would be in his son's best interest if he remained at the police station.  According to ASA Pavlus, Rosemond responded that he needed to leave the police station to check on his other children.

Testifying for the defense, Rosemond testified that on August 15, 1997, at approximately 8:10 p.m., he received a telephone call from an officer at the third district police station asking him to come to the station to pick up defendant.  Rosemond testified that he arrived at the police station at about 8:55 p.m., and after approximately 10 minutes, defendant was released into his custody without any charges.  Rosemond testified that he and defendant then returned home.  Defendant played cards with his brothers, while he sat on his front porch.  Rosemond testified that defendant did not leave his house that night.  Shortly before 10 p.m., Rosemond heard sirens on 71st Street and later that night traffic was rerouted past his home.  Rosemond's house is four blocks from where the fire occurred.

The following morning, at approximately 8:30 a.m., four police officers came to Rosemond's home looking for defendant.  Rosemond testified that the officers told him and his wife that they wanted to talk to defendant concerning a fire that occurred the previous night.  The police officers transported defendant to the police station and Rosemond drove to the station in his own vehicle.  Rosemond testified that a male detective started questioning defendant by asking him what his standing was in the gang.  Defendant responded that he was not in a gang.  Rosemond testified that the detective then stood up in front of defendant, popped his fingers in defendant's face and stated that he hated the GDs.  Defendant again responded that he was not in a gang.  Rosemond testified that the detective told defendant that he was going to find out if defendant was a GD.

The detective then asked defendant where he was on the night of the fire.  Defendant responded that he was at home with his dad.  The detective asked defendant if he knew that someone died in the fire.  Defendant responded no.  Rosemond testified that during the time he was with defendant at the police station, defendant never made any admissions regarding the fire.  He also testified that during defendant's interrogation, he asked for an attorney four times but was told that the matter was not serious enough.  Rosemond testified that when he left the police station, no one tried to encourage him to remain at the station.  He also testified that he never told anyone that he was leaving the police station to check on his other children.  He testified that he left the station because it was a Saturday and he figured most attorneys' offices were closed, so he went home to get his phone book to contact two attorneys he knew.

After Rosemond's direct examination, the prosecutor requested a sidebar.  The prosecutor sought permission to cross-examine Rosemond with the fact that defendant made an admission after he was confronted with the results of his polygraph test.  After hearing arguments on the issue, the trial court determined that the State could present the polygraph evidence in rebuttal, based upon the court’s conclusion that defense counsel's direct examination of Rosemond suggested to jurors that defendant’s statement resulted from a prolonged interrogation.

On cross-examination, Rosemond testified that Detective Bernatek, not Johnson, conducted all the questioning of defendant.  Rosemond acknowledged that Detective Bernatek acted in a threatening manner when he popped his hands in defendant's face.  He also testified that defendant started crying when the detective called him a "piece of s--t."  Rosemond also testified that while he was with defendant at the police station, defendant never admitted to being involved with the fire.

In rebuttal, Detective Bernatek testified that Rosemond never requested an attorney.  The detective denied that he approached defendant in a threatening manner, popped his knuckles in defendant's face or told defendant that he hated GDs.  Detective Bernatek also gave testimony regarding the polygraph test.  He testified that defendant was given a polygraph examination that lasted for approximately 45 minutes.  Detective Bernatek testified that after defendant and his father were given the results of defendant's polygraph test, they were left alone in the interview room for approximately half an hour and afterwards defendant gave his oral statement admitting his involvement in the arson.  The oral statement was reduced to writing at 11 p.m.

ANALYSIS

I. Polygraph Evidence 

Defendant contends that the trial court erred in admitting the polygraph evidence.  In addition, he asserts that even if the polygraph evidence was properly admitted, the erroneous limiting instruction regarding this evidence and the State's improper use of the evidence in closing argument denied him a fair trial.

The State responds that the trial court correctly admitted this evidence to rebut defendant's inference that his statement was coerced.  The State also maintains that the trial court's instruction to the jury regarding the polygraph evidence was proper, because the language in the instruction was based on the same language found proper in 
People v. Melock
, 149 Ill. 2d 423, 599 N.E.2d 941 (1992), pertaining to polygraph evidence.

The general rule in Illinois is that evidence regarding polygraph examinations as well as the results of those examinations is inadmissible as proof of a defendant's guilt or innocence. 
People v. Baynes
, 88 Ill. 2d 225, 240, 430 N.E.2d 1070 (1981); 
People v. Taylor
, 101 Ill. 2d 377, 391-92, 462 N.E.2d 478 (1984); 
People v. Melock
, 149 Ill. 2d 423, 459, 599 N.E.2d 941 (1992); 
People v. Gard
, 158 Ill. 2d 191, 201, 632 N.E.2d 1026 (1994).  The reason is twofold.  First, the results of polygraph examinations are not sufficiently reliable to be used to prove guilt or innocence.  Second, the quasi-scientific nature of the examination may lead jurors to give the polygraph evidence undue weight despite its lack of reliability. 
Taylor
, 101 Ill. 2d at 391-92; 
People v. Jefferson
, 184 Ill. 2d 486, 493, 705 N.E.2d 56 (1998).

Polygraph evidence is generally inadmissible not only to prevent unfair prejudice to a defendant, but also to protect the integrity of the judicial process. 
People v. McClellan
, 216 Ill. App. 3d 1007, 1012, 576 N.E.2d 481 (1991), citing 
Baynes, 
88 Ill. 2d at 244.  Nonetheless, our supreme court has carved out a narrow exception to this broad prohibition against the admission of polygraph evidence.  The State is allowed to present polygraph evidence to explain the circumstances surrounding a defendant's inculpatory statement to police when this evidence is used to refute a claim by defendant that his statement was obtained by coercion. 
Jefferson
, 184 Ill. 2d at 496.

For example, in 
Jefferson
, the defendant 
claimed that she had been coerced into confessing when the police promised her that if she gave a statement she would be released from custody to see her child, whom she had been told had only hours to live.  To rebut defendant's claim of coercion, the State was allowed to present evidence, elicited from defendant on cross-examination and presented through a rebuttal witness, that defendant agreed to undergo a polygraph examination, but before the test could be administered, she told authorities that she wanted to tell the truth and then gave an inculpatory statement.  The 
Jefferson
 court held that the evidence of the impending polygraph examination became admissible to explain the circumstances surrounding defendant giving the inculpatory statement after she testified that her statement was induced by the promise of lenient treatment. 
Jefferson
, 184 Ill. 2d at 496.

In the present case, defendant contends that he did not offer sufficient evidence of coercion to open the door to admission of the polygraph evidence under the narrow exception announced in 
Jefferson
.  The State counters that defense counsel elicited direct testimony from Rosemond which suggested that defendant’s statement was coerced.  Specifically, the State asserts that defendant opened the door for the prosecutor to present the polygraph evidence when Rosemond testified that Detective Bernatek interrogated defendant by popping his fingers in defendant's face, stated that defendant was a GD and that he hated GDs.  The State also points to Rosemond's testimony wherein he testified that he was with defendant at the police station from approximately 9:30 a.m. to 7 p.m., and that during this time period defendant never admitted that he was involved with the fire.  The State claims that this testimony created the inference that defendant's confession resulted from the duration of the interrogation and the fact that Rosemond left defendant at the police station.

It is well settled that the admissibility of a confession that is challenged on the ground that it is involuntary is a matter for the trial court to determine outside the presence of the jury. See 
People v. Gilliam
, 172 Ill. 2d 484, 512, 670 N.E.2d 606 (1996).  Once a defendant's confession is admitted into evidence, a defendant, at trial, still has the right to present evidence affecting the credibility or weight to be given the confession. 
Gilliam
, 172 Ill. 2d at 512-13.

A problem arises, however, when the State characterizes such evidence as evidence of coercion or evidence that creates the inference of coercion and then goes on to argue that it should be allowed to present polygraph evidence to rebut these alleged charges of coercion.  The problem lies in the fact that at trial, unlike a suppression hearing, the issue is the guilt or innocence of the defendant.

However, polygraph evidence introduced at trial may not only serve to rebut charges of coercion; it also purports to measure truthfulness and deception, the very essence of the jury's role, even though the truthfulness or reliability of a confession is not relevant in determining whether the confession was voluntary. See 
People v. Kincaid
, 87 Ill. 2d 107, 117, 429 N.E.2d 508 (1981) (stating that truthfulness or reliability of a confession is irrelevant in determining whether it was voluntarily made).  In light of these issues, we believe that a solution can be found in a trial court's substantial discretion in determining whether to admit evidence.

When assessing the admissibility of polygraph evidence, a trial court should be aware that there are no scenarios in which the potential for prejudice would not exist. See 
Baynes
, 88 Ill. 2d at 244 (stating that prejudicial effects of polygraph evidence substantially outweigh the probative value of admitting such evidence); 
People v. Jackson
, 202 Ill. 2d 361, 373, 781 N.E.2d 278 (2002) (finding that, even in a bench trial, it is plain error for trial court to allow the State to introduce polygraph evidence in anticipation of defendant presenting evidence that would open the door to admission of this otherwise inadmissible evidence); 
People v. Yarbrough
, 93 Ill. 2d 421, 427, 444 N.E.2d 493 (1982) (holding that evidence that a polygraph test was offered to or refused by a defendant was not admissible).

The danger of prejudice is so substantial that exposure of a potential juror to the fact that a polygraph test was administered requires that the juror be excused. 
People v. Taylor
, 101 Ill. 2d 377, 391-93, 462 N.E.2d 478 (1984).  Therefore, before a trial court allows the State to introduce polygraph evidence at trial under the 
Jefferson
 exception, the trial court should apply enhanced scrutiny to ensure that any references to a polygraph are necessary and of minimal prejudicial impact and that no other appropriate alternative impeachment evidence is available to the State.  In addition, the trial court must formulate a clear cautionary instruction for the jury.

In the present case, the State alleges that defendant presented two instances in which he was subjected to undue police pressure.  First, the State points to Rosemond's direct testimony in which he testified that Detective Bernatek intimidated defendant by popping his fingers in defendant's face and stating that defendant was a GD and that he hated GDs.  If the actions attributed to Detective Bernatek were the worst-case scenario experienced by defendant during the interrogation, we do not believe that these actions amounted to coercion that could be characterized as sufficient to open the door to admission of the polygraph evidence under the narrow 
Jefferson
 exception.  Despite Rosemond's direct testimony, the jury could have easily concluded that defendant's confession was reliable and voluntary based on facts imparted through the testimony of the State's witnesses and on physical evidence, such as the gasoline cans recovered at the scene of the fire, without the introduction of the polygraph evidence.

More importantly, the majority of the evidence that the State characterized as coercive was not presented by a defense witness on direct examination, but was elicited by the State itself, during the prosecutor's cross-examination of defense witness Rosemond.  For example, regarding the conduct of Detective Bernatek, the prosecutor elicited the following testimony:

"Q. [Prosecutor]: The police acted sort of in a threatening manner when they extended their hand in front of your son's face?

A. His hands. Plus

THE COURT: Finish your answer.

A. Plus he called him a piece of sh-t.  You ain't nothing but a piece of sh-t.  Then the boy started crying.  Then he told Ms. Johnson only time she did anything.  Was to get him a drink of water.  Said get this garbage a drink of water.  She got up and gave him some water.  Then he continued talking.

Q. [Prosecutor]: So you were concerned about how your son was being treated there at the police station?

A. Yes.

Q. [Prosecutor]: You were worried about his welfare?

A. Yes."

Thus, the record shows that it was the State, not defense counsel, that elicited details about defendant's emotional reaction to Detective Bernatek's behavior.  The State is not entitled to erect a strawman of coercion and then burn it with the fire of polygraph evidence. See, 
e.g.
, 
Jackson
, 202 Ill. 2d at 371 (concluding that it is improper for the State to use polygraph evidence "affirmatively as a sword to advance its own case").  It was improper for the trial court to permit the State to elicit evidence of coercion and then allow the State to present polygraph evidence to rebut this evidence of coercion.

The second claim of coercion set forth by the State and agreed upon by the trial court was the duration of the interrogation.  The State points to Rosemond's testimony where he testified that during the time he was with defendant at the police station, defendant never made any admissions regarding the fire.  The trial court agreed with the State's contention that Rosemond's testimony suggested to jurors that defendant's confession resulted from the duration of his interrogation. However, even if this were so, Rosemond's testimony in this regard was rebutted by the testimonies of both Johnson and ASA Pavlus, who provided explanations for why defendant's statement was obtained at such a late hour.

For example, Johnson testified that defendant's questioning was interspersed with breaks and was not continuous.  She also testified that defendant's statement was reduced to writing after defendant's father left the police station, because ASA Pavlus interviewed other individuals before writing out defendant's statement.  ASA Pavlus testified that from 9 p.m. to 11 p.m., he interviewed various witnesses as well as two individuals who might have participated in the arson.  Afterwards, he took defendant's written statement at about 11 p.m.  ASA Pavlus also gave uncontested testimony that during the time defendant was at the police station he was given food and something to drink.  The facts in this case indicate that there is little basis to conclude that defendant's statement resulted from the duration of his interrogation.  The prosecutor could have rebutted any suggestions otherwise, without ever referring to defendant's polygraph examination, by presenting the testimonies of Johnson and ASA Pavlus. See 
People v. Daniels
, 272 Ill. App. 3d 325, 343-45, 650 N.E.2d 224 (1994) (concluding that it is improper for the State to use polygraph evidence to rebut a defendant's assertion that her confession was the product of a protracted detention).

Rebuttal evidence is evidence which is presented by the prosecution to explain, repel, contradict or disprove evidence presented by a defendant. 
People v. Williams
, 209 Ill. App. 3d 709, 723, 568 N.E.2d 388 (1991).  The trial court has the discretion to admit or exclude rebuttal evidence, and a reviewing court will not disturb the trial court's decision absent an abuse of that discretion. 
Williams
, 209 Ill. App. 3d at 723.  In the present case, we conclude that the trial court abused its discretion in admitting the polygraph evidence because the State's claims of coercion were not sufficient to trigger the admission of polygraph evidence under the narrow 
Jefferson
 exception.

In addition, the record indicates that the trial court's error in admitting the polygraph evidence was exacerbated by its jury instructions regarding this evidence.  The challenged instruction advised the jury as follows:

"You have heard testimony concerning a polygraph test.  The results of any polygraph examination are not admissible as evidence and should not be considered by you in any way.  You should not speculate upon the nonexistence of results on the issue of defendant's guilt or innocence.  The evidence is to be considered solely for the purpose of determining the credibility and reliability of any subsequent statements."

Defendant contends that the trial court incorrectly instructed the jury to consider the polygraph evidence in determining his guilt or innocence.  The State responds that the instruction was properly given since it instructed the jury to consider the polygraph evidence in determining the reliability and credibility of defendant's confession.  The State also maintains that the instruction was proper because the language in the instruction is equivalent to the language of the instruction set forth in 
Melock
.

In 
Melock
, the primary issue was whether the exclusion of evidence of the circumstances surrounding defendant's polygraph examination constituted reversible error where this evidence was offered on the issue of the reliability of the confession. 
Melock
, 149 Ill. 2d at 457.  In 
Melock
, the defendant confessed after the polygraph examiner falsely told him that he had failed the test.  The 
Melock
 court determined that even though defendant was deceived, based on the totality of the circumstances, this deception did not impair the voluntariness of the confession since defendant's will was not so overborne as to render his confession incompetent.  In regard to the "greater issue" of whether defendant was denied a fair trial as a result of the trial court's preclusion of the polygraph evidence, the 
Melock
 court stated:

"We are aware that the term 'polygraph evidence,' broadly construed, may include every aspect concerning polygraphy, including results.  However, defendant's contention on appeal confines our review to a limited aspect of polygraph evidence, 
viz.
, the admissibility of the fact and the circumstances of the polygraph examination.  It bears repeating that, in this case, defendant's polygraph examination yielded no results." 
Melock
, 149 Ill. 2d at 458.

Unlike 
Melock
, in the present case, defendant's polygraph examination did yield results.  In addition, in this case, unlike 
Melock
, there was no issue regarding whether defendant's confession was voluntary; the trial court had already determined that issue against defendant at the suppression hearing.  And unlike 
Jefferson
, defendant in this case never alleged that coercive police conduct impaired the reliability or truthfulness of his statement.  Therefore, it was improper for the jury to be instructed to consider the polygraph evidence in determining the reliability and credibility of defendant's statement.

Finally, defendant asserts that the prosecutor's closing arguments put before the jury improper evidence that defendant had failed the polygraph examination.  Defendant has waived this issue for review by failing to object to the challenged statement at trial.  To preserve an issue for review, a defendant is required to object at trial and file a posttrial motion regarding the issue. 
People v. Enoch
, 122 Ill. 2d 176, 185-87, 522 N.E.2d 1124 (1988).

In sum, we conclude that the trial court abused its discretion in admitting the polygraph evidence because the State's claims of coercion were not sufficient to trigger the admission of polygraph evidence under the narrow 
Jefferson
 exception. 

II. Ineffective Assistance of Counsel

Defendant next contends that he was denied effective assistance of counsel when defense counsel elicited prejudicial testimony from Fernando regarding defendant's alleged gang affiliation and failed to expose Fernando's bias with impeaching evidence that she sold drugs in the building that was set afire.  The State responds that defense counsel's assistance was not ineffective, since counsel's conduct in cross-examining Fernando was based on sound trial strategy.

Basically, we must determine whether defense counsel's cross-examination of Fernando fell below an objective standard of reasonableness as required to support a claim of ineffective assistance of counsel.  A trial counsel's decisions regarding how to cross-examine a witness involve the exercise of professional judgment and are entitled to substantial deference from a reviewing court. 
People v. Pecoraro
, 175 Ill. 2d 294, 326-27, 677 N.E.2d 875 (1997).  Thus, a trial counsel's approach to cross-examination supports a claim of ineffective assistance of counsel only if that approach is objectively unreasonable. 
Pecoraro
, 175 Ill. 2d at 327.  The record indicates that defense counsel's primary strategy was to challenge Fernando's credibility.

Fernando was the State's only occurrence witness.  In an effort to persuade the trial court to admit gang evidence and the hearsay statements of codefendant Mosely, the State proffered that Fernando would testify that defendant was a member of the GDs and that he and Mosely sold drugs outside the building with other gang members.  Based on this offer of proof, the trial court determined that the State could introduce evidence related to gangs and illegal narcotics sales to show motive.  Evidence indicating a defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. 
People v. Smith
, 141 Ill. 2d 40, 58, 565 N.E.2d 900 (1990).  However, gang evidence is only admissible where there is sufficient proof that such membership or activity is related to the crime charged. 
Smith
, 141 Ill. 2d at 58.

In the instant case, the State undertook to demonstrate that defendant was a member of the GDs and that he set the fire on behalf of Mosely and the GDs in retaliation for Fernando reporting on the gang's drug activities outside and around the building.  The major pieces of evidence admitted in support of this theory were defendant's confession and Fernando's testimony.

On cross-examination, defense counsel elicited testimony from Fernando that defendant was arrested for selling drugs outside the building, he regularly used illegal drugs, he was under Mosely's influence, and that someone told her that the arson was a test for defendant to become a gang member or to advance in the gang hierarchy.  The State argues that these disclosures were a matter of trial strategy not subject to a claim of ineffective assistance of counsel.  The State also contends that it was trial strategy for defense counsel not to impeach Fernando with evidence that she sold drugs in the building.

Trial strategies must be shown to be more than unsuccessful to overcome the presumption of soundness. 
People v. Faulkner
, 292 Ill. App. 3d 391, 394, 686 N.E.2d 379 (1997).  However, the presumptive soundness of a criminal defense attorney's performance gives way to a finding of deficient representation when no reasonably effective defense attorney, facing similar circumstances, would pursue such strategies. 
Faulkner
, 292 Ill. App. 3d at 394.  Sound trial strategy embraces the use of established rules of evidence and procedures to avoid, when possible, the admission of incriminating statements, harmful opinions and prejudicial facts. 
People v. Moore
, 279 Ill. App. 3d 152, 159, 663 N.E.2d 490 (1996).

In the present case, assuming that defense counsel's elicitation of the challenged evidence was a matter of trial strategy, it is doubtful that such strategy was sound.  The revelation that defendant used illegal drugs was inadmissible other crimes evidence that had no relevance to any issues in the case.  Moreover, defense counsel elicited inadmissible hearsay from Fernando that someone told her that the arson was a test for defendant to become a gang member or to advance in the gang hierarchy.  It is doubtful that a reasonable defense attorney facing similar trial circumstances would have engaged in such strategies.

Nonetheless, in order to succeed on a sixth amendment claim of ineffective assistance of counsel, the defendant must not only show that counsel's performance was deficient, he must also establish that he was prejudiced by the deficient performance.  Here, defendant fails to establish the prejudice prong.  In order to satisfy this second prong of the 
Strickland
 test, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 
Strickland v. Washington
, 466 U.S. 668, 695, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068-69 (1984); 
People v. Albanese
, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984).  A reasonable probability means a probability sufficient to undermine confidence in the outcome. 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.  The question is not whether defendant would more likely than not have received a different result without counsel's professional errors, but whether, with their presence, he received a fair trial, a trial resulting in a verdict worthy of confidence. 
Moore
, 279 Ill. App. 3d at 159.

In the present case, even if this court were to find that defense counsel's cross-examination of Fernando was objectively unreasonable, defendant was not prejudiced by the evidence elicited by counsel on cross-examination.  Fernando testified on direct examination that defendant was a member of the GDs and that she saw defendant, Mosely, and other gang members regularly sell drugs outside the building.  She also testified that after she heard Mosely yell to burn the building down, she saw defendant and Wilson run past her apartment door and down the smoke-filled hallway.  Fernando's testimony on direct examination independently corroborated defendant's statement that Mosely yelled three times to burn the building down.  In addition, the gasoline cans recovered from the scene of the fire corroborated defendant's statement concerning how the fire was started.  Consequently, defendant is unable to satisfy the prejudice prong of the 
Strickland
 test.

Accordingly, for the reasons set forth above, because there was sufficient evidence in the record to support defendant's conviction (
People v. Taylor
, 76 Ill. 2d 289, 309-10, 391 N.E.2d 366 (1979)), defendant's conviction is reversed and the cause is remanded to the circuit court of Cook County for a new trial.

Reversed and remanded. 

SOUTH, P.J., and WOLFSON, J., concur. 

FOOTNOTES
1: At this point, the trial court denied defense counsel's motion for a mistrial based on Johnson's reference to "what the results were."  Outside the jury's presence, the trial court admonished Johnson to avoid making any references to results, examinations, or polygraphs.