954 N.E.2d 743 (2011)
352 Ill. Dec. 660
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Leonard LOGAN, Defendant-Appellant.
No. 1-09-3582.
Appellate Court of Illinois, First District, First Division.
June 27, 2011.
*746 Exoneration Project at the University of Chicago Law School, Chicago (Jon Loevy, Russell Ainsworth, Gayle Horn, Tara Thompson, Elizabeth Wang, Nicholas Soltman, of counsel), for appellant.
Anita M. Alvarez, State's Attorney (Alan J. Spellberg, Miles J. Keleher, Brian K. Hodes, Assistant State's Attorneys, of counsel), Abraham D. Zisook, law student, for People.

OPINION
Justice ROCHFORD delivered the judgment of the court, with opinion.
¶ 1 A jury convicted defendant, Leonard Logan, of first-degree murder and the circuit court imposed a 45-year sentence. Defendant now appeals the order of the circuit court denying his petition for postconviction relief following an evidentiary hearing. Defendant contends: (1) his appellate and trial counsels committed ineffective assistance; and (2) the circuit court erred by failing to grant an evidentiary hearing on all of his postconviction claims. We affirm.
¶ 2 Testimony at trial established that, on March 18, 1997, between 11 and 11:30 p.m., L.C. Robinson was driving north on Yates Boulevard in Chicago. As he crossed through the intersection at Yates Boulevard and 75th Street, he saw his friend, Charles Jenkins, talking on a pay phone at an Amoco station located on the corner of that intersection. He also saw the victim, Timothy Jones, talking on a second pay phone. Mr. Robinson watched as a "short, about 5' 9", 5' 10", kind of heavy-set" African-American man got out of a sport utility vehicle (SUV) that was parked approximately 20 feet from the pay phones. The man approached the pay phones. When he was two or three feet away, he pulled a gun from his waistband and aimed it at the victim's head. Mr. Robinson watched as the man shot the victim. He saw the victim fall to the ground and then saw the shooter fire two or three more shots at other people in the vicinity.
¶ 3 Mr. Robinson watched as the shooter entered the front passenger side of the SUV, which then drove down 75th Street. Mr. Robinson made a U-turn and followed the SUV westbound on 75th Street. He wrote down the vehicle's license plate number and dialed 911 and gave the 911 operator this information. Mr. Robinson followed the SUV until it turned into an alley and then he returned to the Amoco station, where he told the police what he had seen.
¶ 4 The Chicago police traced the license plate to a Budget Rent-A-Car rental agency and determined that the SUV had been rented to an L. Payton. Detectives Alejandro Almazon, William Higgins and Edward O'Boyle went to the apartment of Latonya Payton at approximately 6:30 p.m. on March 19, 1997. The detectives first asked Ms. Payton about two men they had seen in the hallway as they approached her apartment. Ms. Payton denied knowing the men. The detectives then asked Ms. Payton about the SUV. Ms. Payton told them that she had rented it and that it had been parked in front of her building from the evening of March 18, 1997, to March 19, 1997. When the detectives told Ms. Payton that the SUV was involved in a shooting, she again told them that it had been parked in front of her building and she had no knowledge of what they were talking about.
¶ 5 The detectives asked Ms. Payton about the beer bottles and the two large pizzas in her apartment and she admitted that the two men that the police had seen walking down the hallway were friends of hers and had been in her apartment. Ms. Payton told the detectives that another friend of hers borrowed the SUV on March 18, but this person was not either of *747 the two men who had just left her apartment. Ms. Payton did not give the detectives the names of the two men who had just left her apartment. The detectives told her that the shooting was a homicide and Ms. Payton agreed to go to the police station to speak with the detectives about the shooting. The detectives also brought the SUV to the police station for evidence processing. They left Ms. Payton's apartment at approximately 6:45 p.m. on March 19, 1997.
¶ 6 At the police station, Ms. Payton initially stated that a man named Rodman had borrowed the SUV on the night of the murder and returned it 20 minutes later. Ms. Payton later stated that Rodman and defendant had borrowed the SUV on the night of the murder and returned with it at approximately 2 a.m. Ms. Payton eventually gave a different statement implicating defendant. During this statement, Ms. Payton told the detectives that, on March 18, 1997, defendant was driving the SUV down 75th Street, while she sat in the front seat and Rodman sat in the backseat. They were approaching Yates Boulevard when defendant pulled into a gas station and exited the SUV. He pulled a gun out of his waistband and started shooting at a man who was on the telephone. Defendant then turned, shot down the alley at another person, got back into the vehicle and sped away. As he was driving, defendant noticed another car following them so he pulled into an alley to elude the vehicle. Then he drove to Stateway Gardens. There, defendant went into one of the apartment buildings and returned after about 10 minutes. Defendant had changed his clothes and he no longer had the gun with him.
¶ 7 Ms. Payton commemorated this account in a handwritten statement to assistant State's Attorney Kent Sinson at approximately 7:50 a.m. on March 21, 1997. Ms. Payton subsequently testified before the grand jury consistent with her statement.
¶ 8 At trial, Ms. Payton testified that her grand jury testimony and her written statement had been coerced by the officers' threats to charge her with the murder unless she implicated defendant. Ms. Payton also testified that the officers prevented her from eating or sleeping for three days until she agreed to make the statement implicating defendant. The officers testified that Ms. Payton was not threatened with being charged for the murder and that no one ever told her the facts or any details surrounding the shooting of the victim.
¶ 9 To rebut Ms. Payton's claim that her written statement and grand jury testimony had been coerced by the officers' threats to charge her with the murder, the State sought to elicit testimony from her that she made her written statement and testified before the grand jury only after being confronted with results of two polygraph examinations. During a sidebar outside the presence of the jury, defense counsel "vigorously" objected to the admission of the polygraph evidence on the basis that such evidence is unreliable. The State assured the court that it would limit its questioning to how the results of the polygraph examinations affected Ms. Payton's decision to implicate defendant in her written statement and grand jury testimony, and that it would not ask Ms. Payton what the results of her polygraph examinations were. The court ruled that the evidence was admissible to rebut Ms. Payton's allegation that her statement and grand jury testimony were coerced. The court stated it would give a limited instruction at the close of trial.
¶ 10 Ms. Payton subsequently testified that, after confronting her with the results of the second polygraph examination, the officers told her to make a statement implicating *748 defendant. The State did not question Ms. Payton about the results of the polygraph tests, and Ms. Payton never specifically testified what the results of the polygraph tests were.
¶ 11 Following Ms. Payton's testimony, defense counsel questioned a detective about the accuracy of the polygraph tests and elicited testimony that they "are not admissible in a court of law." Defense counsel then asked whether this was because the tests were "proven to be inaccurate." The court sustained the prosecutor's objection and instructed the jury:
"These questions, ladies and gentlemen, the testimony concerning the polygraph is to be utilized by you only as to how it explains how the police conducted their investigation and why they asked certain questions of the witness. And the results of the polygraph are not relevant and not pertinent, and are not going to be revealed to you. And you are not to speculate or guess what the polygraph results are, and the polygraph results themselves are not relevant in this case. It only explains how the detectives conducted their investigation and their interviews and what they did with that examination and how it was utilized in interviewing Miss Payton."
¶ 12 Charles Jenkins testified he was talking on a pay phone next to the victim at the Amoco Station at 75th and Yates Boulevard on March 18, 1997, at about 11:30 p.m., when a truck pulled into the Amoco station and stopped five or six feet away from them. A young man exited the truck and walked toward them as though he was going to use a pay phone. Mr. Jenkins kept turning to look at the man as he approached and he saw the man pull a gun. He watched as the man put the gun to the victim's head and shot him. Mr. Jenkins then dropped the phone and started to run through an alley, when he was shot in the back by the same man who shot the victim. At trial he described the shooter as 5 feet 6 inches or 5 feet 7 inches tall and 160 to 170 pounds. Mr. Jenkins testified that the shooter's complexion was darker than his own and that defendant is not the man who shot him.
¶ 13 The State presented evidence that police removed two compact discs and three compact disc cases from the SUV. A fingerprint on one of the compact discs belonged to defendant. Defendant's fingerprint was on one of the beer bottles that was in Ms. Payton's apartment on March 19.
¶ 14 Chicago police officer Hasan Al-Amin testified that defendant was arrested on June 20, 1997.
¶ 15 The jury convicted defendant of murder and the trial court sentenced him to 45 years' imprisonment. Defendant filed a posttrial motion alleging, in pertinent part, that his trial counsel was ineffective for failing to call available witnesses Princess Thomas, Chevelle Thomas, and Earlene Logan, who purportedly would have testified that defendant was in Milwaukee at the time of the shooting. The circuit court held an evidentiary hearing on defendant's posttrial motion. At the hearing, defendant's sister, Earlene Logan, testified that, the day before the murder, she drove defendant to Milwaukee and dropped him off at her aunt's house. Ms. Logan believed defendant still was in Milwaukee on the day of the murder. Ms. Logan testified she had been unable to relay this information to defendant's trial counsel because he refused to talk to her.
¶ 16 John Miraglia testified at the posttrial hearing that, at the time of defendant's trial, he was a law student extern with the public defender's office. Mr. Miraglia assisted defendant's trial counsel, who asked him to speak with defendant's family members at the close of the State's case and tell them that defense counsel did *749 not think calling alibi witnesses would be beneficial to defendant. Mr. Miraglia so informed the family members, who voiced no objections.
¶ 17 Martin Kelly, the first chair in defendant's defense team, testified at the posttrial hearing that the decision not to present the alibi witnesses was one of trial strategy. Mr. Kelly testified he believed the defense case was strong even without the alibi witnesses because Mr. Jenkins had testified that defendant was not the shooter and because Ms. Payton had recanted her statement and grand jury testimony against defendant. Mr. Kelly testified that the alibi witnesses told him they did not want to testify because they were afraid "other things would come out," specifically, "some past domestic violence issue with [Ms. Payton]." Mr. Kelly further explained that "if the defense puts on an alibi, even though it is not suppose[d] to happen legally, realistically the burden shifts. All of a sudden, the jury is not focused on the reasonable doubt issue of making the State prove their case, but did the defense prove him innocent, if they proved their alibi." Mr. Kelly explained that he wanted the jury "to remain focused on the State's case, and what [he] perceived to be its weakness." Finally, Mr. Kelly stated that he did not want to provide the State the opportunity to call rebuttal witnesses as a result of testimony provided by the alibi witnesses. The rebuttal witnesses would have testified that, at the time of his arrest for the murder, defendant had in his possession a substantial amount of cash and drugs. Mr. Kelly stated he explained all this to defendant, who agreed not to call the alibi witnesses.
¶ 18 Following the hearing, the circuit court denied defendant's posttrial motion. Defendant filed a direct appeal, arguing that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State made improper remarks during closing argument; (3) the State failed to prove he was fit for trial; and (4) his trial counsel provided ineffective assistance by failing to call the alibi witnesses who would have testified he was in Milwaukee at the time of the murder and by forcing him to waive his right to testify. We affirmed defendant's conviction and one justice dissented. See People v. Logan, 352 Ill. App.3d 73, 287 Ill.Dec. 186, 815 N.E.2d 830 (2004), appeal denied, 212 Ill.2d 545, 291 Ill.Dec. 712, 824 N.E.2d 288 (2004).
¶ 19 Defendant filed a petition for postconviction relief and raised five claims: (1) his appellate counsel denied him effective assistance by failing to raise meritorious issues; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) Ms. Payton's statements were improperly admitted into evidence in violation of section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2000)); (4) his trial counsel denied him effective assistance by failing to present the testimony of the alibi witnesses, and by forcing him to waive his right to testify; and (5) his right to due process was violated by the State's closing argument.
¶ 20 Defendant subsequently filed a supplemental petition for postconviction relief, incorporating his initial postconviction petition and supplementing it with the following additional claims: (1) his rights to a fair trial and due process were violated where evidence of Ms. Payton's polygraph examinations was repeatedly introduced, the results of the polygraph exams were made clear to the jury, and no written limiting instruction was given; (2) trial counsel denied him effective assistance by failing to tender a written limiting instruction; (3) appellate counsel denied him effective assistance by failing to raise arguments regarding the improper admission of the polygraph examination and trial counsel's failure to tender a written limiting *750 instruction; (4) trial counsel denied him effective assistance by failing to present alibi witnesses; (5) trial counsel denied him effective assistance by his opening statement and closing arguments wherein he ineffectively tried to explain his failure to present alibi witnesses and appellate counsel denied him effective assistance by failing to raise this issue on appeal; (6) trial counsel denied him effective assistance by failing to present evidence that at the time of the shooting, a caller to 911 gave a description of the shooter that did not match defendant; and (7) the cumulative errors of trial counsel denied him effective assistance.
¶ 21 The State filed a motion to dismiss the petitions. The circuit court granted defendant a new trial based on the admission of the polygraph evidence without any written limiting instruction. The court also stated that trial counsel's failure to call the alibi witnesses factored into the decision to grant a new trial. The State appealed. We reversed and remanded, holding that the circuit court had erred by granting defendant a new trial at the second stage of postconviction proceedings without giving the State an opportunity to file an answer and without conducting an evidentiary hearing. See People v. Logan, No. 1-07-1478 (2008) (unpublished order under Supreme Court Rule 23). On remand, the case was assigned to a different judge.
¶ 22 Defendant filed a motion to clarify the scope of the evidentiary hearing arguing that he should be allowed to pursue all of his postconviction claims. The circuit court limited the hearing to a consideration of: (1) defendant's claims of ineffective assistance of trial and appellate counsel with respect to the admission of the polygraph evidence and the failure to submit written limiting instructions; and (2) defendant's claim of ineffective assistance of trial counsel for his failure to call the alibi witnesses. The court determined that these were the only postconviction claims that had survived the State's motion to dismiss.
¶ 23 At the evidentiary hearing, defendant's stepaunts, Princess and Chevelle Thomas, testified that defendant came to Milwaukee in March 1997 to celebrate their mother's birthday. However, neither Princess nor Chevelle remembered the exact dates when defendant arrived or departed. Princess testified she was in court during defendant's trial, and she has "no idea" why she was not called to testify on his behalf. Chevelle also testified she attended defendant's trial but never "[got] a chance" to testify.
¶ 24 Defendant's lead trial attorney, Mr. Kelly, testified he was a public defender from 1987 through 2007. Consistent with his testimony at the posttrial hearing, Mr. Kelly explained that he decided not to call the alibi witnesses for several reasons and that his thoughts about whether they should testify were "in flux" during the trial. Mr. Kelly testified that he ultimately determined that the State's case was not strong enough to meet its burden of proving defendant's guilt beyond a reasonable doubt, and he decided not to call the alibi witnesses because he was concerned that the jury would shift the burden to defendant to prove the alibi. Mr. Kelly also testified that he did not call the alibi witnesses so as to prevent the State from being able to present rebuttal evidence concerning defendant's pending drug case. Mr. Kelly further testified that he did not call the alibi witnesses because they could not state with specificity when defendant was in Milwaukee, and because he had discovered that defendant had lied to him when he claimed to have been in Milwaukee for all of March 1997; Mr. Kelly's own research indicated that defendant had been in court in Illinois for the pending *751 drug case on March 17, 1997. Mr. Kelly also testified that the alibi witnesses had indicated that they did not want to testify, and that one of them expressed concern that her testimony would reveal prior domestic violence between defendant and Ms. Payton. However, both alibi witnesses testified at the hearing contrary to Mr. Kelly that they had been willing to testify and did not know anything about defendant's relationship with Ms. Payton.
¶ 25 With respect to the polygraph evidence, Mr. Kelly testified that he filed a motion in limine to prevent its admission and that the only evidence admitted was that Ms. Payton took two polygraph examinations; the test results were not introduced. Mr. Kelly testified that the court delivered an oral limiting instruction. Mr. Kelly explained that he did not request a written limiting instruction because the references at trial to the polygraph evidence "were so scant" that sending a written limiting instruction to the jury would unduly focus the jury's attention on it and "blow it way out of proportion for what it is worth."
¶ 26 Defendant's appellate counsel, assistant public defender Tim Leeming, testified his normal practice was to raise all viable issues on appeal. Mr. Leeming did not have any notes about how he had analyzed defendant's case when he prepared his appeal, but he explained that, in preparing appeals, he typically reads the posttrial motion, closing arguments, opening statements, and the transcript of the trial from start to finish. A supervisor or third party also reads the record and consults with him regarding the issues that should be raised on appeal.
¶ 27 Mr. Leeming testified he does not remember why he failed to raise the admission of the polygraph evidence and the lack of a written limiting instruction as issues on appeal. Mr. Leeming noted, though, that defense counsel arguably waived any error regarding the admission of the polygraph evidence by "adopt[ing] the polygraph and [making] the best of it to stress their theory of the defense."
¶ 28 Following all the testimony, the circuit court denied defendant's postconviction petition, finding that defense counsel's decision not to call the alibi witnesses was protected trial strategy and did not constitute ineffective assistance. The circuit court also found that the polygraph evidence was admissible for the limited purpose of rebutting Ms. Payton's testimony at trial that her statement implicating defendant had been coerced and that trial counsel made the strategic decision not to ask for a written limiting instruction. Accordingly, the circuit court found no ineffective assistance on the part of appellate counsel in failing to raise these issues on direct appeal.
¶ 29 Defendant now appeals the denial of his postconviction petition following the evidentiary hearing.
¶ 30 A postconviction petition is a collateral attack on a conviction and sentence; thus, postconviction proceedings involve only constitutional matters that have not been, nor could have been, previously decided. People v. Rissley, 206 Ill.2d 403, 411-12, 276 Ill.Dec. 821, 795 N.E.2d 174 (2003). In a noncapital case, the Post-Conviction Hearing Act (725 ILCS 5/122-1 et seq. (West 2000)) provides a three-stage process for postconviction relief. At the first stage, the trial court examines the petition to determine only if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2), (b) (West 2000). If the petition is not dismissed at this stage, the process moves to the second stage whereby the circuit court determines whether the petition alleges a substantial showing of a constitutional violation. People v. Coleman, 183 Ill.2d 366, 381, 233 Ill.Dec. 789, 701 N.E.2d 1063 (1998). If the petition *752 survives the second stage, the process continues to the third stage where the trial court holds an evidentiary hearing on the petition. People v. Mitchell, 189 Ill.2d 312, 322, 245 Ill.Dec. 1, 727 N.E.2d 254 (2000). Following a third-stage evidentiary hearing where fact-finding and credibility determinations are made, the circuit court's decision will not be reversed unless it is manifestly erroneous. People v. Beaman, 229 Ill.2d 56, 72, 321 Ill.Dec. 778, 890 N.E.2d 500 (2008). However, if no new evidence is presented at the evidentiary hearing and the issues presented are pure questions of law, review is de novo. Beaman, 229 Ill.2d at 72, 321 Ill.Dec. 778, 890 N.E.2d 500.
¶ 31 The present case involves an appeal from the denial of defendant's postconviction petition following a third-stage evidentiary hearing. In denying the petition, the circuit court made findings of fact that trial and appellate counsel committed no ineffective assistance. Accordingly, we review whether the court's decision was manifestly erroneous. Beaman, 229 Ill.2d at 72, 321 Ill.Dec. 778, 890 N.E.2d 500. We note, though, that even if we were to apply a de novo standard of review, our holding here affirming the circuit court would be the same.
¶ 32 First, defendant contends the circuit court erred in denying his postconviction petition where the evidentiary hearing established that his appellate counsel provided ineffective assistance. To determine whether defendant was denied his right to effective assistance of counsel, we apply the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defendant must show first, that "counsel's representation fell below an objective standard of reasonableness" (Strickland, 466 U.S. at 688, 104 S.Ct. 2052), and second, that he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
¶ 33 To prevail on his claim of ineffective assistance, defendant must satisfy both prongs of the Strickland test. If we can dispose of defendant's ineffective assistance claim because he suffered no prejudice, we need not address whether his counsel's performance was objectively reasonable. People v. Lacy, 407 Ill.App.3d 442, 457, 347 Ill.Dec. 1013, 943 N.E.2d 303 (2011).
¶ 34 A claim of ineffective assistance of appellate counsel is considered under the same standard as a claim of ineffective assistance of trial counsel. Lacy, 407 Ill.App.3d at 457, 347 Ill.Dec. 1013, 943 N.E.2d 303. Defendant must show that appellate counsel's failure to raise an issue on direct appeal was objectively unreasonable and that defendant was prejudiced thereby. People v. Childress, 191 Ill.2d 168, 175, 246 Ill.Dec. 352, 730 N.E.2d 32 (2000). Appellate counsel is not required to raise all conceivable issues on appeal. Lacy, 407 Ill.App.3d at 457, 347 Ill.Dec. 1013, 943 N.E.2d 303. Unless the underlying issue has merit, defendant suffers no prejudice from appellate counsel's failure to raise an issue on appeal. Lacy, 407 Ill.App.3d at 457, 347 Ill.Dec. 1013, 943 N.E.2d 303.
¶ 35 Defendant contends his appellate counsel denied him effective assistance by failing to raise the issue of the alleged error in admitting the polygraph evidence. The general rule in Illinois is to preclude introduction of evidence regarding polygraph examinations and their results because: (1) the evidence is not sufficiently reliable to establish guilt or innocence; and (2) the quasi-scientific nature of the polygraph examination may cause the trier of fact to give it undue *753 weight, despite its lack of reliability. People v. Jefferson, 184 Ill.2d 486, 493, 235 Ill.Dec. 443, 705 N.E.2d 56 (1998). However, the rule of exclusion is not without exception. Jefferson, 184 Ill.2d at 493, 235 Ill.Dec. 443, 705 N.E.2d 56.
¶ 36 In Jefferson, the supreme court held that the trial court properly admitted evidence of a scheduled polygraph examination where the defendant there claimed that her inculpatory statement had been coerced by police. Jefferson, 184 Ill.2d at 496, 235 Ill.Dec. 443, 705 N.E.2d 56. Specifically, the defendant testified during her direct examination that she signed an inculpatory statement because a police officer told her that her daughter only had hours to live and that if she signed the statement she could see her daughter and her parents and go home. Jefferson, 184 Ill.2d at 490-91, 235 Ill.Dec. 443, 705 N.E.2d 56. During cross-examination, the State sought to admit evidence that the defendant actually made her inculpatory statement after learning she was scheduled for a polygraph examination. Jefferson, 184 Ill.2d at 491, 235 Ill.Dec. 443, 705 N.E.2d 56. The circuit court admitted the evidence. Jefferson, 184 Ill.2d at 491, 235 Ill.Dec. 443, 705 N.E.2d 56. The supreme court held that the defendant's claim that the police had coerced her statement opened the door to the introduction of the evidence of the scheduled polygraph examination as an alternative explanation for her confession. Jefferson, 184 Ill.2d at 495, 235 Ill.Dec. 443, 705 N.E.2d 56. The supreme court noted that "[n]ot allowing the State to introduce this evidence would have left the jurors with a misleading impression about the circumstances in which the defendant made her confession. The trial judge properly allowed the prosecution to introduce this evidence for the limited purpose of explaining why the defendant agreed to make and sign the statement." Jefferson, 184 Ill.2d at 496, 235 Ill.Dec. 443, 705 N.E.2d 56.
¶ 37 In contrast, the supreme court held in People v. Jackson, 202 Ill.2d 361, 269 Ill.Dec. 481, 781 N.E.2d 278 (2002), that the trial court erred by admitting evidence in a bench trial that a witness took a polygraph test. During his direct examination by the State, the witness in Jackson contradicted his earlier statement inculpating the defendant, but did not say that the police had coerced his statement. Jackson, 202 Ill.2d at 364-65, 269 Ill.Dec. 481, 781 N.E.2d 278. In response to this testimony, the State questioned the witness whether he made the inculpatory statement after taking a polygraph examination and being told by the examiner that he was a liar. Jackson, 202 Ill.2d at 365, 269 Ill.Dec. 481, 781 N.E.2d 278. When defense counsel objected, the State argued that the polygraph evidence was admissible to show the course of conduct that led to the witness's prior statement inculpating the defendant. Jackson, 202 Ill.2d at 365, 269 Ill.Dec. 481, 781 N.E.2d 278. The trial court admitted the evidence "for a limited purpose." Jackson, 202 Ill.2d at 365, 269 Ill.Dec. 481, 781 N.E.2d 278. The State then questioned the witness about the polygraph examination, and he admitted that he implicated the defendant after being confronted with the negative polygraph results. Jackson, 202 Ill.2d at 365, 269 Ill.Dec. 481, 781 N.E.2d 278. In later testimony, the witness claimed for the first time that his statement was coerced by police. Jackson, 202 Ill.2d at 365, 269 Ill.Dec. 481, 781 N.E.2d 278.
¶ 38 The supreme court reversed, noting that in contrast to Jefferson, the polygraph evidence was presented prior to the witness's claim of police coercion and therefore the evidence served no legal purpose at the time of its admission. Jackson, 202 Ill.2d at 370-71, 269 Ill.Dec. 481, 781 *754 N.E.2d 278. Whereas in Jefferson the State used the polygraph evidence as a "shield" against the defendant's allegation of police coercion, in Jackson the State improperly "attempted to use the evidence affirmatively as a sword to advance its own case." Jackson, 202 Ill.2d at 371, 269 Ill. Dec. 481, 781 N.E.2d 278. The supreme court stated it "did not approve the offensive use of polygraph evidence in Jefferson, and [it] will not now allow the State to create a straw man only to knock him down, all within its own case in chief." Jackson, 202 Ill.2d at 371, 269 Ill.Dec. 481, 781 N.E.2d 278. The supreme court held that it was "plain error to admit polygraph evidence in a criminal trial in anticipation of evidence potentially justifying its admission as an alternative explanation for an inculpatory statement." Jackson, 202 Ill.2d at 373, 269 Ill.Dec. 481, 781 N.E.2d 278.
¶ 39 The present case falls within Jefferson rather than Jackson, as the circuit court here admitted the polygraph evidence only after Ms. Payton testified that her statement and grand jury testimony implicating defendant had been coerced by the police. Unlike in Jackson, there was no improper anticipatory introduction of the polygraph evidence because Ms. Payton's claim of coercion was already before the jury. As in Jefferson, the polygraph evidence was admissible as a shield against Ms. Payton's claim that her inculpatory statement and grand jury testimony were the product of police coercion. As the admission of the polygraph evidence was not error, defendant's appellate counsel was not ineffective for failing to raise the issue on direct appeal. Lacy, 407 Ill. App.3d at 457, 347 Ill.Dec. 1013, 943 N.E.2d 303.
¶ 40 Defendant argues that People v. Rosemond, 339 Ill.App.3d 51, 274 Ill.Dec. 40, 790 N.E.2d 416 (2003), compels a different result. In Rosemond, the defendant there was charged with first-degree murder, aggravated arson, and intimidation in connection with the death of Zulean Wilson, who died of smoke inhalation from a fire set in the building in which she lived. Rosemond, 339 Ill.App.3d at 53, 274 Ill.Dec. 40, 790 N.E.2d 416. At trial, Sergeant Peggy Johnson testified she and a detective transported the defendant to police headquarters following the fire, where he was read his Miranda rights. Rosemond, 339 Ill.App.3d at 55, 274 Ill.Dec. 40, 790 N.E.2d 416. The defendant's father, James Rosemond, arrived approximately 10 minutes later and he was present in the interview room during the defendant's questioning. Rosemond, 339 Ill.App.3d at 55, 274 Ill.Dec. 40, 790 N.E.2d 416. The defendant initially stated he knew nothing about the fire but eventually confessed to his involvement. Rosemond, 339 Ill. App.3d at 55, 274 Ill.Dec. 40, 790 N.E.2d 416. Sergeant Johnson acknowledged that the defendant's statement was reduced to writing after Mr. Rosemond left the police station. Rosemond, 339 Ill.App.3d at 56, 274 Ill.Dec. 40, 790 N.E.2d 416.
¶ 41 Testifying for the defense, Mr. Rosemond stated in pertinent part that at the police station, a male detective questioned the defendant about his standing in the Gangster Disciples (GDs) gang. Rosemond, 339 Ill.App.3d at 57, 274 Ill.Dec. 40, 790 N.E.2d 416. When the defendant responded that he was not in a gang, the detective stood in front of the defendant, "`popped his fingers in [the] defendant's face and stated that he hated the GDs.'" Rosemond, 339 Ill.App.3d at 57, 274 Ill. Dec. 40, 790 N.E.2d 416. Mr. Rosemond testified that during the time he was in the police station, from approximately 9:30 a.m. to 7 p.m., the defendant never admitted his involvement with the setting of the fire. Rosemond, 339 Ill.App.3d at 60, 274 Ill.Dec. 40, 790 N.E.2d 416.
*755 ¶ 42 On cross-examination, the prosecutor elicited the following testimony from Mr. Rosemond:
"`Q. [Prosecutor]: The police acted sort of in a threatening manner when they extended their hand in front of your son's face?
A. His hands. Plus
THE COURT: Finish your answer.
A. Plus he called him a piece of sh-t. You ain't nothing but a piece of sh-t. Then the boy started crying. Then he told Ms. Johnson only time she did anything. Was to get him a drink of water. Said get this garbage a drink of water. She got up and gave him some water. Then he continued talking.
Q. [Prosecutor]: So you were concerned about how your son was being treated there at the police station?
A. Yes.
Q. [Prosecutor]: You were worried about his welfare?
A. Yes.'" Rosemond, 339 Ill.App.3d at 61-62, 274 Ill.Dec. 40, 790 N.E.2d 416.
¶ 43 During rebuttal, Detective Bernatek testified that the defendant was given a polygraph examination lasting approximately 45 minutes. Rosemond, 339 Ill. App.3d at 58, 274 Ill.Dec. 40, 790 N.E.2d 416. After the defendant and Mr. Rosemond were informed of the results, the defendant gave his statement admitting his involvement in the arson. Rosemond, 339 Ill.App.3d at 58, 274 Ill.Dec. 40, 790 N.E.2d 416.
¶ 44 On appeal from his conviction, the defendant argued that the circuit court erred by admitting the polygraph evidence. Rosemond, 339 Ill.App.3d at 58, 274 Ill.Dec. 40, 790 N.E.2d 416. The State responded that the circuit court properly admitted the polygraph evidence to rebut the defendant's inference that his statement was coerced. Rosemond, 339 Ill. App.3d at 58-59, 274 Ill.Dec. 40, 790 N.E.2d 416. We disagreed, noting that "the State points to Rosemond's direct testimony in which he testified that Detective Bernatek intimidated [the] defendant by popping his fingers in [the] defendant's face and stating that [the] defendant was a GD and that he hated GDs. If the actions attributed to Detective Bernatek were the worst-case scenario experienced by [the] defendant during the interrogation, we do not believe that these actions amounted to coercion that could be characterized as sufficient to open the door to admission of the polygraph evidence under the narrow Jefferson exception." Rosemond, 339 Ill. App.3d at 61, 274 Ill.Dec. 40, 790 N.E.2d 416. We further noted that Mr. Rosemond did not testify to any coercion until cross-examination, when the State specifically elicited such testimony by asking him about the "threatening manner" in which the police acted toward the defendant. Rosemond, 339 Ill.App.3d at 61, 274 Ill. Dec. 40, 790 N.E.2d 416. The State then introduced the polygraph evidence to rebut the evidence of coercion which it had purposely elicited on cross-examination. Rosemond, 339 Ill.App.3d at 62, 274 Ill. Dec. 40, 790 N.E.2d 416. On these facts, we held that the State had improperly used the polygraph evidence as a sword to advance its own case. Rosemond, 339 Ill. App.3d at 62, 274 Ill.Dec. 40, 790 N.E.2d 416.
¶ 45 In contrast, the polygraph evidence here was properly used as a shield, not as a sword. During its case in chief, the State called Ms. Payton as a witness. Ms. Payton was the only person who had made a statement identifying defendant as the shooter. During direct examination, the State questioned Ms. Payton about whether she had seen defendant at the time of the shooting. Ms. Payton said no. The State then properly questioned Ms. Payton whether she had previously made a contrary statement to police implicating defendant in the shooting. Ms. Payton responded *756 that the police had told her to implicate defendant. The State followed up by asking what the police had done to make her implicate defendant, and Ms. Payton responded that the police had "transpired" her to implicate defendant by threatening to charge her with the murder. The State subsequently questioned Ms. Payton as to whether she had given testimony before the grand jury implicating defendant. Ms. Payton responded "yes" but volunteered that her grand jury testimony had been "coerced." The State again followed up by asking how her grand jury testimony had been coerced, and Ms. Payton responded that two officers threatened to charge her with first-degree murder.
¶ 46 In contrast to Rosemond, Ms. Payton's testimony about coercion came during her direct examination, not on cross-examination, and concerned the circumstances surrounding her own statements. Ms. Payton's testimony was not made in response to any initial questions by the State regarding whether her statements were coerced but, rather, was volunteered by her in response to questions by the State concerning whether she had made statements implicating defendant. Unlike in Rosemond, the State did not initiate the discussion of the alleged coercion, but merely followed up with questions after Ms. Payton raised the alleged coercion herself. On these facts, the State properly introduced polygraph evidence as a shield against Ms. Payton's claims that her statements were coerced. Accordingly, the circuit court committed no error by admitting the polygraph evidence and therefore defendant's appellate counsel was not ineffective for failing to raise the issue on direct appeal.
¶ 47 Defendant argues that the polygraph evidence was not necessary to rebut Ms. Payton's allegations of coercion, as police and an assistant State's Attorney were available to testify and deny any coercion occurred. In support, defendant cites the following statement in Rosemond: "[B]efore a trial court allows the State to introduce polygraph evidence at trial under the Jefferson exception, the trial court should apply enhanced scrutiny to ensure that any references to a polygraph are necessary and of minimal prejudicial impact and that no other appropriate alternative impeachment evidence is available to the State." (Emphasis added.) Rosemond, 339 Ill.App.3d at 61, 274 Ill.Dec. 40, 790 N.E.2d 416.
¶ 48 Self-serving testimony from the assistant State's Attorney and police officers denying that any coercion occurred would not have been as effective as the admission of the polygraph evidence in rebutting Ms. Payton's claim that her statements were coerced. The supreme court has expressly held that the failure to allow the State to introduce polygraph evidence in response to testimony that a confession was coerced would leave the jurors with "a misleading impression" about the circumstances surrounding the confession. Jefferson, 184 Ill.2d at 496, 235 Ill.Dec. 443, 705 N.E.2d 56. Accordingly, we hold that the circuit court committed no error in admitting the polygraph evidence for the limited purpose of rebutting Ms. Payton's allegations of coercion, and therefore appellate counsel committed no ineffective assistance by failing to raise the issue on direct appeal.
¶ 49 Next, defendant contends his appellate counsel was ineffective for failing to argue on direct appeal that the limiting instruction given by the circuit court with respect to the admission of the polygraph evidence was insufficient to prevent the jury from speculating that Ms. Payton had failed her polygraph examinations. The record indicates that after admitting the polygraph evidence, the circuit court informed the parties during a sidebar that it *757 would give a limiting instruction during jury instructions at the close of trial. The parties voiced no objections to deferring the giving of a limiting instruction until the close of trial. The trial resumed, and defense counsel subsequently questioned one of the detectives about the polygraph tests. The circuit court sustained the prosecutor's objection and orally instructed the jury that the polygraph evidence was admitted only to show how the police conducted their investigation and why they asked certain questions of Ms. Payton. The court also instructed the jury that the polygraph results were not relevant, that they would remain unrevealed, and the jury was "not to speculate or guess what the polygraph results are." Later, during the jury instruction conference, defense counsel did not tender a written limiting instruction and none was given to the jury. However, the court did instruct the jury that evidence received for a limited purpose should not be considered for any other purpose.
¶ 50 Defendant argues that the circuit court should have given its oral limiting instruction at the time when the polygraph evidence was admitted, and that the court should have given a further written limiting instruction at the close of trial. However, defendant waived review by failing to argue for such a limiting instruction either at the time of the admission of the polygraph evidence or at the close of trial. See People v. Gacho, 122 Ill.2d 221, 253, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988). Even if the issue had not been waived, there would have been no cause for reversal. As discussed, the circuit court orally informed the jury as to the limited purpose of the polygraph evidence and that the jury was not to speculate or guess what the results are. At the close of trial, the circuit court gave the jury Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed.2000) (hereinafter IPI Criminal 4th No. 1.01), which stated in pertinent part that evidence received for a limited purpose should not be considered for any other purpose. Taken together, the oral limiting instruction coupled with IPI Criminal 4th No. 1.01 sufficiently informed the jury that it was not to speculate as to the results of the polygraph examinations. Accordingly, defendant's claim of instructional error is without merit and he suffered no prejudice from appellate counsel's failure to raise it on appeal; therefore, defendant's contention of ineffective assistance of appellate counsel is without merit. Lacy, 407 Ill. App.3d at 457, 347 Ill.Dec. 1013, 943 N.E.2d 303.
¶ 51 Further, to the extent that defendant is arguing that his trial counsel was ineffective for failing to tender a limiting instruction, such an argument fails because trial counsel explained at the evidentiary hearing that he made the strategic decision not to tender the limiting instruction so as not to focus the jury's attention on the polygraph evidence. See People v. Mims, 403 Ill.App.3d 884, 890, 343 Ill.Dec. 342, 934 N.E.2d 666 (2010) ("A decision that involves a matter of trial strategy will typically not support a claim of ineffective representation.").
¶ 52 Next, defendant contends his appellate counsel was ineffective for failing to argue on direct appeal that the State made improper remarks during closing arguments when it suggested Ms. Payton confessed after failing her second polygraph exam. Specifically, the prosecutor stated that Ms. Payton goes "down to 11th and State, another polygraph. Comes back and confront[ed] with the results. Boom. She tells the statement. Now she's just caught in so many lies to the time she's got to * * * tell the truth."
¶ 53 Defendant waived review by failing to object to the prosecutor's comments. People v. Enoch, 122 Ill.2d 176, 186, 119 Ill.Dec. 265, 522 N.E.2d 1124 (1988). Even *758 if the issue had not been waived, there would have been no cause for reversal. People v. Johnson, 208 Ill.2d 53, 281 Ill. Dec. 1, 803 N.E.2d 405 (2003), is controlling. In Johnson, a police officer testified that the defendant there gave an inculpatory statement after being "confronted with the results" of his "interview" at the police station. Johnson, 208 Ill.2d at 94, 281 Ill.Dec. 1, 803 N.E.2d 405. During closing arguments, the State commented "`[Defendant] knows they are on to him. He knows they areit's starting to stack up against him. One last chance. Let me go downtown. I'll show you. When he bombs that and he comes back in, he's confronted with the results of his interview downtown, he knows it's over.'" Johnson, 208 Ill.2d at 101, 281 Ill.Dec. 1, 803 N.E.2d 405. The supreme court found that the prosecutor's comment, when considered with the officer's testimony, suggested the defendant had taken and failed a polygraph test. Johnson, 208 Ill.2d at 104, 281 Ill.Dec. 1, 803 N.E.2d 405. The supreme court held, though, that "even if the jury speculated at that point in the trial as to the prosecutor's references, and the nature of the evidence upon which those references were based, the inference that [the defendant] had taken and failed a polygraph was, by that point in the proceedings, properly drawn and considered. Evidence that a polygraph exam had taken place could be properly considered because defense counsel had made the `reliability' of [the defendant's] statement an issue in his opening remarks to the jury and, by the time of closing arguments, he had elicited testimony calling into question the circumstances of [the defendant's] confession." (Emphasis in original.) Johnson, 208 Ill.2d at 104-05, 281 Ill.Dec. 1, 803 N.E.2d 405. The supreme court further held that "the prosecutor's argument in this respect was not improper, as [the defendant's] subsequent introduction of evidence, making the circumstances of his confession an issue in the case, opened the door for a prosecutorial argument suggestingwithout specifically statingthat [the defendant] had confessed after he failed a polygraph exam." Johnson, 208 Ill.2d at 106, 281 Ill.Dec. 1, 803 N.E.2d 405.
¶ 54 Unlike in Johnson, it was the State's witness here (Ms. Payton) who made the circumstances of her statement an issue in the case by testifying that it had been coerced by the police officers who had threatened to charge her with the murder unless she implicated defendant. However, as discussed earlier in this opinion, Ms. Payton's testimony was sufficient under Jefferson to open the door to the admission of the evidence that she made her statement after being informed of the results of her second polygraph exam. Once the door was opened and the polygraph evidence was admitted, the prosecutor could comment thereon by suggesting, without specifically stating, that Ms. Payton had made her statement after failing the second polygraph exam. Johnson, 208 Ill.2d at 106, 281 Ill.Dec. 1, 803 N.E.2d 405. Thus, defendant's claim of error regarding the prosecutor's closing argument is without merit, and therefore he was not prejudiced or denied effective assistance by appellate counsel's failure to raise it on appeal. Lacy, 407 Ill.App.3d at 457, 347 Ill.Dec. 1013, 943 N.E.2d 303.
¶ 55 Next, defendant contends his trial counsel committed ineffective assistance at trial when he failed to deliver on his promise to the jury during his opening statement that he would call alibi witnesses. Defendant waived review of this issue by failing to raise it on direct appeal. See People v. Towns, 182 Ill.2d 491, 503, 231 Ill.Dec. 557, 696 N.E.2d 1128 (1998) ("Issues that could have been presented on direct appeal, but were not, are waived" on postconviction review.).
*759 ¶ 56 Even if this issue had not been waived, we would find no cause for reversal. During the evidentiary hearing on defendant's postconviction petition, defense counsel (Mr. Kelly) explained that he changed his mind about calling the alibi witnesses once the State completed its case in chief without eliciting evidence that defendant had a pending drug case. Mr. Kelly stated that at the beginning of trial, he had "thought for sure that the State would bring in the arrest." Mr. Kelly decided not to call the alibi witnesses so as to prevent the State from eliciting evidence of the arrest in rebuttal. Mr. Kelly further testified that after the State rested, he learned from his law clerk that the alibi witnesses did not wish to testify, and that one of the alibi witnesses expressed concern that the State might ask her about "a domestic violence issue" between defendant and Ms. Payton. Mr. Kelly also testified that he decided not to call the alibi witnesses because they could not specifically state what day defendant allegedly was in Milwaukee and because defendant had given Mr. Kelly inaccurate information as to the dates he had been in Milwaukee. Mr. Kelly testified that at the close of trial he felt he had a strong case for acquittal and he was "very, very afraid that by putting alibi witnesses on especially ones that [he] believed were rather tenuous, that [defendant's] case, its worth would diminish drastically." Mr. Kelly also testified to his concern that if he called the alibi witnesses, the jury would shift the burden of proof to the defense.
¶ 57 Defendant cites various cases holding that defense counsel's failure to deliver on a promise to call certain witnesses constituted ineffective assistance. See People v. Chandler, 129 Ill.2d 233, 249, 135 Ill. Dec. 543, 543 N.E.2d 1290 (1989); People v. Ortiz, 224 Ill.App.3d 1065, 167 Ill.Dec. 112, 586 N.E.2d 1384 (1992); People v. Briones, 352 Ill.App.3d 913, 287 Ill.Dec. 909, 816 N.E.2d 1120 (2004); Anderson v. Butler, 858 F.2d 16 (1st Cir.1988). However, unlike in Chandler, Ortiz, Briones, or Anderson, Mr. Kelly testified in detail as to his many strategic reasons for changing his mind about calling the alibi witnesses. There was no ineffective assistance here.
¶ 58 Finally, defendant contends the circuit court erred on remand when it limited the third-stage evidentiary hearing to a consideration of: (1) defendant's claims of ineffective assistance of trial and appellate counsel with respect to the admission of the polygraph evidence and the failure to submit written limiting instructions; and (2) defendant's claim of ineffective assistance of trial counsel for his failure to call the alibi witnesses. Defendant argues that we should remand for a third-stage evidentiary hearing on all the other claims he raised in his original and supplemental postconviction petitions. Defendant further contends that, "at the very least", we should remand for a second-stage consideration of those other claims, as well as second-stage consideration of a new claim raised in a second supplemental petition for postconviction relief that was never filed. We disagree. Review of the record indicates that on second-stage review of defendant's postconviction and supplemental postconviction petitions, the circuit court granted a new trial based on the admission of the polygraph evidence without any written limiting instruction. The court also stated that defense counsel's failure to call the alibi witnesses "factored into" its decision to grant a new trial. The court did not state that the other claims in defendant's postconviction and supplemental postconviction petitions factored into its decision to grant a new trial; accordingly, on this record, we find that the circuit court implicitly dismissed all of defendant's other claims. See People v. Lara, 317 Ill.App.3d 905, 908, 251 Ill.Dec. 792, 741 N.E.2d 679 (2000) (partial dismissals on *760 second-stage review are allowable). On appeal by the State, we reversed and remanded for an evidentiary hearing only on the ineffective assistance of counsel claims which the circuit court had found merited a new trial. See Logan, No. 1-07-1478 (unpublished order under Supreme Court Rule 23). Accordingly, the circuit court committed no error in limiting the evidentiary hearing to only those claims of ineffective assistance of counsel. Defendant is not entitled to second- or third-stage consideration of any other claims.
¶ 59 For the foregoing reasons, we affirm the circuit court.
¶ 60 Affirmed.
Presiding Justice HALL and Justice HOFFMAN concurred in the judgment and opinion.