2021 IL App (1st) 171533-UB
Order filed: May 14, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-17-1533

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 2607 |
| | ) | |
| EDWIN MARTINEZ, | ) | Honorable |
| | ) | Colleen Ann Hyland, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Third-stage denial of postconviction petition is affirmed, where defendant failed to establish that his trial counsel provided ineffective assistance of counsel.

¶ 2    In a prior order entered by this court, following the third-stage denial of postconviction relief to defendant-appellant, Edwin Martinez, we ruled that the circuit court made two evidentiary errors at the third-stage hearing and remanded with directions that the court reopen the evidentiary hearing so that it could consider additional evidence. *People v. Martinez*, 2019 IL App (1st) 171533-U. This court retained jurisdiction to consider, if necessary, defendant's primary contention that he established a denial of his right to effective assistance of trial counsel. *Id.* ¶ 98.

Upon remand, the circuit court once again denied defendant postconviction relief. For the following reasons, we affirm.

¶ 3    In January 2001, defendant was charged by indictment with, *inter alia*, multiple counts of first degree murder.[1] The indictment generally alleged that, on or about December 27, 2000, defendant shot and killed Robert Sanchez with a firearm. The matter proceeded to a bench trial in 2003.

¶ 4    Adam Reyes, a member of the Satan Disciples street gang and a convicted felon, testified that defendant was a leader of the Satan Disciples and supplied drugs that were sold by both Reyes and Sanchez. In November 2000, defendant asked Reyes to deal with Sanchez because he was an informant and "tellin' the cops on [defendant]." Reyes dismissed defendant's request as "just talk" and did not take defendant seriously. The following month, Reyes declined defendant's second request to "take care" of Sanchez and defendant indicated he would deal with the problem himself. However, several days later, on December 24, defendant was with Reyes and Rachel Narbaiz, a/k/a, Rachel Martinez, in an automobile behind Narbaiz's home and defendant asked them to shoot Sanchez. Reyes and Narbaiz both refused.

¶ 5    At about 7:30 p.m. on December 27, 2000, defendant called Reyes and asked to borrow a .380–caliber pistol which Reyes had obtained from Mark Alonzo. Approximately 20 to 30 minutes thereafter, defendant arrived at Reyes' residence located in Cicero, Illinois. Defendant told Reyes that he planned to lure Sanchez into the woods by explaining that he had to dispose of the gun. After receiving the gun, defendant drove away with Sanchez in the car. At about 9:40 p.m.,

---

[1] Relevant portions of this order have been taken from the three prior decisions issued by this court with respect to defendant's conviction and postconviction proceedings. See *People v. Martinez*, 1-04-0126 (2006) (unpublished order under Supreme Court Rule 23); *People v. Martinez*, 2014 IL App (1st) 112794-U; *Martinez*, 2019 IL App (1st) 171533-U.

defendant called Reyes and stated that everything was "mashed potatoes and gravy," which Reyes understood to mean that defendant had killed Sanchez. Reyes and defendant met at the home of their mutual friend, Samantha Mercado, at about 1:30 a.m. the following day and then went for a drive. Defendant told Reyes that he "smoked Bobby, shot him in the head, and that he cried like a bitch." Defendant said he disposed of the gun he used to murder Sanchez.

¶ 6    On cross-examination, Reyes testified that he had an agreement with the State whereby he would not be charged in the murder of Sanchez if he told the State everything he knew about the shooting. Reyes also testified that after he received the gun from Alonzo, he kept it at his house for a time. He later wrapped the gun in a towel and stored it at Samantha Mercado's house for a few days. On redirect examination, Reyes clarified that his agreement with the State was to tell only the truth and that the State made no promise that he would not be charged in the murder of Sanchez.

¶ 7    Samantha Mercado testified she was a friend of Reyes and in 2000 had known defendant for two years. At that time, she lived in Cicero, and Reyes, Sanchez and defendant would come to her house "and party." On the evening of December 27, 2000, she was at Reyes' house and defendant came to the house, talked to Reyes, and then left. Mercado testified on cross-examination, that on that evening she did not see Reyes hand a gun—or anything else—to defendant.

¶ 8    Mario Abarca, Sanchez's stepfather, testified his stepson and defendant were friends. Defendant had been living at Mario's home in Cicero, and on December 27, 2000, Sanchez left his house with defendant between 7 and 8 p.m. Mario never saw Sanchez again.

¶ 9    Benjamin Abarca, Mario's brother, testified that he was involved in drug transactions with Sanchez and was also living in his brother's house with Sanchez. He last saw Sanchez on

December 27, 2000, when Sanchez left the house between 6:30 and 7:30 p.m. Benjamin later called Sanchez several times that evening, but Sanchez never returned his calls. When Benjamin called Sanchez again between 9:30 and 10 p.m., defendant answered the phone and explained that Sanchez had lent defendant the cell phone.

¶ 10    Iliana Herrera, Sanchez's girlfriend, testified that on December 27, 2000, she called Sanchez's cell phone at 7:33 p.m. and his pager at 11:15 p.m. but Sanchez did not respond. When she called Sanchez's cell phone shortly after midnight on December 28, 2000, defendant answered. Defendant told her that he had driven Sanchez to the home of Oscar Solis, and that Sanchez had left his cell phone in defendant's car. Solis testified, however, that he did not see Sanchez on the night of December 27.

¶ 11    Elba Luna testified her sister June was dating defendant in December 2000. On December 24, 2000, Luna and her mother and sister moved to "the south side." On the afternoon of December 28, 2000, Luna gave Sanchez's cell phone to Sanchez's sister at Sanchez's home, after defendant had given the phone to her and driven her there.

¶ 12    Cook County Sheriff's investigator John G. Sheridan testified that the police discovered Sanchez's body at Sundown Meadows Forest Preserve (forest preserve) near the Village of Hodgkins at about 6 p.m. on December 28, 2000. The body was found in an area of the forest preserve which was about four to five blocks' distance from its entrance. Sanchez had suffered gunshot wounds to the head and shell casings were found around the body. On cross-examination, investigator Sheridan was asked if he found a restaurant receipt on the body and he answered that "[t]here was a receipt found" and it was turned over as evidence.

¶ 13    Elwin Trammell, who was a Cook County Forest Preserve police sergeant, testified that he interviewed defendant on January 4, 2001. In the interview, defendant admitted to being a member

of the Satan Disciples and a drug dealer, and stated that both Reyes and Sanchez helped him sell drugs. Defendant said he had previously lived at Sanchez's home for about three months but was now living at his grandmother's house in Chicago. Defendant first told Trammell that he last saw Sanchez on December 26, 2000, at the Cicero home of defendant's mother. Sanchez had been in defendant's car on that night. On the night of December 27, after discovering Sanchez's cell phone in the back seat of his car, he went to Sanchez's house to return it but no one was home. Defendant later told Trammell that on December 27, after helping his girlfriend move, he visited Sanchez at his home between 8 and 9 p.m., and that Sanchez's stepfather answered the door. He also said he spent the night at his girlfriend's new home on December 27. Defendant also said that on December 28, 2000, he went to the Sanchez home and gave Sanchez's phone to his sister. When Trammell pointed out the discrepancies in his statements, defendant responded he was confused about the dates.

¶ 14    The parties stipulated to the admission of phone records, which indicated a number of incoming and outgoing calls from Sanchez's cell phone on the evening in question, including incoming calls from Benjamin and Iliana. Sanchez's cell phone records also showed that calls were made from Sanchez's cell phone to Reyes' cell phone on December 27, 2000, between 7:32 p.m. and 9:42 p.m. Other telephone records admitted into evidence by stipulation showed calls made to Sanchez's cell phone from Benjamin's phone at 8:21 p.m., 8:22 p.m., 8:23 p.m., 8:27 p.m., 8:28 p.m., 8:29 p.m., 8:32 p.m., 8:35 p.m., 8:44 p.m., 8:58 p.m., 9:30 p.m., 9:31 p.m., and 10:06 p.m. on December 27, 2000. It was further stipulated that the shell casings found near the body of Sanchez were from a gun described as a "Winchester 380 Auto caliber."

¶ 15    After the State rested, and defendant's motion for directed finding was denied, trial counsel told the trial court there was a stipulation that the police evidence inventory listed "two receipts."

The trial court stated that the information on the receipts was hearsay and could not "be used" as substantive evidence. The State and trial counsel agreed with this conclusion. Defendant then rested.

¶ 16    Following closing arguments, the trial court found defendant guilty of first-degree murder after concluding that the evidence—although circumstantial—was sufficient to prove defendant guilty of murder beyond a reasonable doubt. In making its determination, the trial court credited Reyes' testimony, *i.e.*, that defendant solicited him to kill Sanchez, defendant explained to Reyes why he had to borrow his .380-caliber gun, and defendant called Reyes to tell him that he killed Sanchez. The trial court found that this testimony was corroborated by the forensic evidence and the phone records introduced at trial. The trial court also noted the inconsistencies in defendant's statements to Trammel. The trial court sentenced defendant to 50 years' imprisonment.

¶ 17    In *People v. Martinez*, 1-04-0126 (2006) (unpublished order under Supreme Court Rule 23), this court affirmed defendant's conviction on direct appeal. In so ruling, we rejected defendant's challenge to the sufficiency of the evidence after specifically noting that the trial court found Reyes to be a credible witness and that Reyes' testimony was corroborated by the telephone records, the forensic evidence, and the testimony of other witnesses. *Id.*, slip order at 10-11.

¶ 18    On July 24, 2007, defendant filed a *pro se* postconviction petition, pursuant to the Post–Conviction Hearing Act (Act) (720 ILCS 5/122–1 *et seq*. (West 2008)), alleging in pertinent part that his trial counsel was ineffective for failing to interview and subpoena Narbaiz. Defendant attached the affidavit of Narbaiz, in which she attested that defendant never asked her to kill Sanchez, nor did he ask Reyes to kill Sanchez in her presence. She denied being in a car behind her house with Reyes and defendant on December 24, 2000. Narbaiz further attested that she was interviewed by investigators in 2002, but was never contacted by defendant's attorney. Defendant's

*pro se* petition also attached a report describing the interview of Narbaiz, conducted at her home by investigators from the office of the Cook County State's Attorney. The summary of the interview states Narbaiz denied that defendant had asked her and Reyes to kill Sanchez. Narbaiz also told the investigators she was in jail at the time of the murder after having been arrested on December 26, 2000, when her actual arrest date was December 27, 2000. The report reveals that defendant's brother, Giovanni Martinez, was in the kitchen and listening to the interview.

¶ 19 Defendant's own affidavit, also attached to the petition, stated that he informed trial counsel about Narbaiz. Defendant also averred that he told trial counsel there was no truth to Reyes' claims that he solicited Reyes and Narbaiz "to kill anyone."

¶ 20 The *pro se* petition advanced to the second stage. On October 1, 2010, defendant's appointed postconviction counsel filed a supplemental petition which presented additional ineffectiveness claims. The supplemental petition claimed counsel was ineffective for failing to interview or present Diana Mercado as a witness at trial. In her attached notarized and signed statement, Diana stated that approximately one week prior to the murder, Reyes came to her house with a gun which he wanted to leave there. When Diana told Reyes that he could not leave the gun, he called a cab and waited outside the house to be picked up. Reyes told her that he was going to use the gun to kill Sanchez. Her daughter, Samantha, never told her that Reyes had asked to hide a gun in their house, and Diana never saw a gun in the house at any time in December 2000. Diana was not interviewed by the police, nor was she interviewed by defense counsel.

¶ 21 The supplemental petition also attached a supplementary report of Trammell. This report stated that, during an interview, Reyes stated that Alonzo gave him a .380–caliber automatic pistol in mid-December 2000 to use for protection from a rival gang. Reyes brought the gun to Samantha's house and asked Diana if he could leave the gun there. Reyes wrapped the gun in a

towel, and "stashed the weapon underneath Sam's bed, unbeknownst to her." The supplementary report also stated that after defendant had asked Reyes and Narbaiz to shoot Sanchez on December 24, 2000, Reyes was upset and went to the Mercado house.

¶ 22    The supplemental petition also added a claim that trial counsel was ineffective for failing to present the testimony of defendant's mother, Maritza Amaya, and for failing to present the contents of a restaurant receipt which was recovered from Sanchez's pocket when his body was discovered. In support, the supplemental petition included a police inventory report which showed that a receipt was recovered from Sanchez's body. The receipt was from the Aguascalientes restaurant, located in Cicero, which was dated December 27, 2000, and time stamped "20:24 p.m." (presumed to be 8:24 p.m.). In an attached affidavit, Maritza averred that defendant and Sanchez left her house at approximately 6:30 p.m. on December 27, 2000, to go to the Aguascalientes restaurant. Defendant returned "sometime before 9 p.m." and stayed for about an hour. Maritza said she attended most court dates in the case, and trial counsel neither interviewed her nor asked her about the whereabouts of defendant on December 27, 2000. Based on the affidavits and receipt, defendant argued that it is "highly unlikely" that he killed Sanchez because the restaurant receipt showed that Sanchez was still alive at 8:24 p.m., while defendant had returned to his mother's house sometime before 9 p.m.

¶ 23    On December 10, 2010, the State moved to dismiss defendant's postconviction petitions and defendant filed a response. Following a hearing, the postconviction court granted the State's motion to dismiss.

¶ 24    On appeal from that decision, defendant argued that his postconviction petitions made a substantial showing that his trial counsel was ineffective for failing to investigate and present available testimony from Narbaiz, Diana, and Maritza, and by failing to introduce the contents of

the restaurant receipt as substantive evidence. Defendant maintained the testimony and evidence would have undermined the credibility of Reyes and would have established a timeline showing it was improbable that defendant committed the murder. After noting that "[t]he case against defendant was largely circumstantial and turned almost entirely on the testimony of Reyes" (*People v. Martinez*, 2014 IL App (1st) 112794-U, ¶ 34), this court agreed. We specifically explained that "based on the record before us and taking defendant's well-pleaded facts and accompanying affidavits as true, we hold that defendant has made a substantial showing of ineffective assistance of trial counsel based on the cumulative failure to investigate the testimony of witnesses Rachel Narbaiz, Diana Mercado, and Maritza Amaya and to introduce the receipt from the Aguascalientes restaurant as substantive evidence" (*id.* ¶ 47). We therefore reversed the judgment of the circuit court and remanded for an evidentiary hearing. *Id.* ¶ 48.

¶ 25    Upon remand, the parties and the circuit court addressed several prehearing issues. First, the parties exchanged witness lists in preparation for the evidentiary hearing. The potential witnesses identified by defendant included, *inter alia*: (1) the keeper of records for the Aguascalientes restaurant, later identified as Martha Macias, (2) Maritza's husband and defendant's step-father, Pablo Amaya, and (3) Eladio Valdez, an investigator employed by defendant's postconviction counsel. The State orally objected to these proposed witnesses, and the circuit court asked the parties to place their arguments with respect to these witnesses in writing, so as to resolve any issues prior to the evidentiary hearing.

¶ 26    Defendant responded on April 4, 2016, by filing a "Second Supplemental Petition" that included affidavits executed by Macias, Pablo[2] and Valdez. In her affidavit, Macias generally

---

[2] Pablo's affidavit was completed in Spanish, and was accompanied by an English translation.

averred that the Aguascalientes restaurant was her family's business and that she had worked there since at least 2000. She also averred that the receipt recovered from Sanchez's pocket was "consistent with a receipt printed during the regular course of business activity at Tacqueria Aguascalientes in December 2000. The date and time on this receipt indicates to me that it was printed on December 27, 2000 at 20:24, or 8:24 p.m." Finally, Macias asserted that no one associated with defendant's trial counsel—Joseph Lopez—ever contacted anyone associated with the restaurant.

¶ 27    In his affidavit, Pablo averred facts that could have corroborated his wife's account of the evening of December 27, 2000; *i.e.*, that he was also home that evening and observed that defendant returned home before 9:00 p.m. More specifically, Pablo averred that prior to December 2000 he had worked a 7:00 a.m. to 3:00 p.m. first-shift at a factory for many years, but in December 2000 he had recently switched to working a 3:00 p.m. to 11:00 p.m. second-shift. Pablo specifically averred that: "When working First Shift, it was my general practice to get ready for bed before 9:00 p.m. I was usually in bed or asleep by approximately 9:00 p.m." However, in December 2000, the factory was closed the week between Christmas and New Year's Day. Nevertheless, Pablo averred that he knew it was before 9:00 p.m. when defendant returned to his home on December 27, 2000, "because I was getting ready for bed." He also averred that no one associated with Lopez ever contacted him.

¶ 28    Valdez's affidavit documented the time it took him to drive—at the speed limit and obeying all traffic laws—from Reyes' house to the Aguascalientes restaurant at 7:32 p.m. (8 minutes), from the restaurant to the entrance to the forest preserve at 8:25 p.m. (16 minutes), and then from the forest preserve entrance to Pablo and Maritza's home (19 minutes). Valdez asserted

that these driving times were based on the fastest routes identified by Google Maps, and the routes were traveled a single time each and timed on February 15 and March 8, 2016.

¶ 29    The State thereafter filed a combined motion *in limine* and objection to the second supplemental petition, asking the circuit court to deny leave to file the second supplemental petition and/or preclude the new witnesses identified therein from testifying at the evidentiary hearing. The State argued that allowing the newly identified witnesses to testify would go beyond the limited scope of this court's remand, would violate the statutory scheme of the Act by allowing defendant to assert additional claims of ineffective assistance of counsel and actual innocence at the third-stage, and would introduce irrelevant matters into the hearing.

¶ 30    In an oral ruling issued on July 22, 2016, the circuit court ruled as follows: (1) Macias would be allowed to testify, as this court's remand for an evidentiary hearing had specifically called for a consideration of Lopez's possible ineffectiveness in failing to introduce the Aguascalientes restaurant receipt as substantive evidence at trial; (2) Pablo would not be allowed to testify, as his proposed testimony had not previously been raised in any of defendant's postconviction petitions, and was not contemplated by or related to any issue identified by this court's remand order, and (3) Valdez would not be allowed to testify, because whatever Valdez did in 2016 was irrelevant to determining Lopez's possible ineffectiveness at defendant's 2003 trial.

¶ 31    The circuit court also granted a prehearing motion filed by the State seeking a finding that, considering defendant's allegations of ineffective assistance of counsel, defendant had waived his attorney-client privilege. The circuit court ruled that Lopez would therefore be allowed to testify regarding his conversations with defendant.

¶ 32    At the evidentiary hearing, Macias, Maritza, Narbaiz and defendant all generally testified consistently with their previously filed affidavits. Macias further indicated that the receipts at her restaurant were printed after a guest had completed their meal. Maritza specifically admitted that, while she never looked at a clock, she knew defendant returned to her home around 9:00 p.m. on December 27, 2000, because defendant returned just as her husband was brushing his teeth and getting ready for bed, which he always did at that time. On cross-examination, Maritza admitted that her previously executed affidavit did not indicate exactly how she knew defendant returned around 9:00 p.m. Maritza's testimony also reflected some amount of confusion regarding the circumstances that surrounded the execution of her affidavit. Narbaiz's testimony revealed similar confusion regarding the execution of her affidavit.

¶ 33    Defendant testified that Lopez never visited him in jail or spoke to him on the phone in preparation for trial. His only conversations with Lopez were brief and occurred in connection with status hearings, at which time Lopez only discussed the payment of his fees. Defendant contended that he never had substantive discussions with Lopez about his case prior to trial, with Lopez rebuffing his attempts by telling defendant not to worry, and that everything was under control. Defendant testified that, during his trial, he told Lopez that Reyes was lying regarding any conversations he had with Narbaiz and told Lopez that he was at his mother's home on December 27, 2000. Defendant claimed that Lopez never discussed the receipt with him. On cross-examination, defendant denied that he ever admitted to Lopez that he had murdered Sanchez.

¶ 34    Thereafter, the State called its only witness—Lopez—to testify. Lopez testified that he was a criminal defense attorney with extensive experience in murder cases. While he initially had no independent recollection of defendant's case, his memory was refreshed after reviewing various documents in preparation for the hearing.

¶ 35    Specifically, Lopez testified that he recalled having numerous, substantive conversations regarding defendant's case and trial strategy prior to trial, including conversations with defendant, Narbaiz, Maritza and other members of defendant's family. With respect to Narbaiz, Lopez testified that, despite referencing her proposed testimony in his opening statement, he made the strategic decision not to call her as a witness. This was because the presence of defendant's brother when Narbaiz was interviewed by investigators in October 2002 made her denials regarding defendant's purported statements to her and Reyes "look[] kind of staged."

¶ 36    With respect to defendant himself, Lopez testified that he never asked defendant about fees. In preparing for trial, Lopez and defendant discussed the State's timeline, the restaurant receipt, and defendant's whereabouts on December 27, 2000. Additionally, Lopez testified that prior to Sanchez's death defendant inquired about the possibility Sanchez could be a government informant, and that prior to trial defendant admitted to shooting and killing Sanchez.

¶ 37    Lopez explained that his trial strategy was to establish that Reyes was an unreliable witness and focus on the lack of corroborating evidence. With respect to the State's timeline, Lopez admitted that he described the restaurant receipt as "the most telling piece of evidence" in his opening statement at trial. He also admitted that he was aware of the business record exception to the rule against the substantive admission of hearsay evidence at the time of trial, but did not seek to lay a foundation for the substantive admission of the receipt on that basis. Finally, Lopez admitted that he had the ability to determine the time it would take to travel from Reyes' home to the Aguascalientes restaurant, from the restaurant to the entrance to the forest preserve, and then from the forest preserve entrance to Pablo and Maritza's home, but he did not do so.

¶ 38    At the conclusion of the hearing, the circuit court denied defendant's written motion to take judicial notice of certain driving distances. In the motion, which was supported by Google Maps

printouts, defendant specifically asked that the circuit court take judicial notice of the shortest driving distance between Reyes' house and the Aguascalientes restaurant (2.1 miles), from the restaurant to the entrance to the forest preserve (10.8 miles), and from the forest preserve entrance to Pablo and Maritza's home (10.9 miles). After noting that the Google Maps website automatically determined the shortest route, and that there was "no indication of the driving conditions, the time period, the weather, or any of those things that obviously would affect the reliability of such Google map," the circuit court concluded "I have no indication how reliable those Google Maps are, or if they were in existence back in 2000. So your motion is respectfully denied with regards to these driving distances."

¶ 39    Following oral argument, the circuit court denied defendant's postconviction petition in an oral ruling issued on June 16, 2017. The circuit court began by noting its understanding that this court's order remanding the matter for an evidentiary hearing, which accepted the truth of the well-pleaded facts and affidavits in defendant's petitions, concluded that defendant had made a substantial showing of Lopez's ineffectiveness based on "the cumulative failure to investigate" the testimony of Narbaiz, Diana, and Maritza, and to introduce the Aguascalientes restaurant receipt as substantive evidence. The trial court then indicated its understanding that, in our prior order, this court "ordered the hearing so that the postconviction court could resolve *those issues*, and determine whether defendant had met his burden and shown that Lopez was ineffective." (Emphasis added.)

¶ 40    In general, the circuit court found Narbaiz, Maritza and defendant to be incredible witnesses, while Lopez was found to have "testified very credibly."[3] With respect to Narbaiz, the

_____

[3] After noting that Diana was not called to testify at the evidentiary hearing, nor had postconviction counsel specifically argued Lopez's ineffectiveness for failing to call her as a witness at the hearing, the

circuit court found her to have a "very selective memory" and to have a "very questionable memory" with respect to the execution of her affidavit. As such, the circuit court concluded that Lopez's decision not to call her at trial was "a sound decision due to serious credibility concerns that [Narbaiz] posed."

¶ 41    With respect to Maritza, the circuit court specifically considered whether Lopez interviewed defendant's mother and whether he "was ineffective for not calling her as a witness in order to dispute the State's timeline." The court found Maritza's testimony to be "very incredible," and specified that she became "very confused" when "confronted with questions about her affidavit." The court thus gave "little to no weight" to her testimony about her affidavit, and further concluded that her testimony that she knew defendant returned to her home around 9:00 p.m. on December 27, 2000, "because her husband was brushing his teeth is very implausible." After noting that it credited Lopez's testimony that he spoke with Maritza in preparation for trial, the circuit court concluded that "[t]here is no question in my mind that trial counsel was not ineffective for [not] presenting Maritza at trial because of the dubious nature of the information and the manner that it came out during the third stage evidentiary hearing."

¶ 42    The circuit court also contrasted defendant's testimony with that of Lopez, "a 30-year veteran criminal defense attorney, who testified very credibly as to his many conversations with defendant about the case and his trial strategy to attack the credibility of the State's witness, who, according to Lopez, was not corroborated." After discussing Lopez's testimony regarding defendant's purported (and disputed) admission to committing the murder and recognizing Lopez's continuing obligation to provide a vigorous defense without suborning perjury, the circuit

_____

circuit court also concluded that the decision not to call her "should be considered sound trial strategy." That ruling has not been challenged on appeal.

- 15 -

court concluded that Lopez used "appropriate trial strategy and did use the consideration of how to proceed with the case with the knowledge of all of the facts that he had presenting the appropriate trial strategy."

¶ 43    The circuit court again discussed its understanding that this court remanded for an evaluation of Lopez's failure to introduce the Aguascalientes restaurant receipt as substantive evidence at trial. The circuit court agreed that Lopez did not introduce the receipt as "substantive evidence," and that "information on the receipt" shows "that the victim would be alive as [of] 8:24 p.m. on December 27th of 2000." However, the circuit court did "not agree that the time on the receipt necessarily helps the Defense." The circuit court reasoned that the State's timeline showed that defendant called Reyes to get the gun at 7:30 p.m., and made another call to Reyes around 9:40 p.m., reporting that he had killed Sanchez. The circuit court also noted that defendant "actually did have the victim's phone. So the victim's phone can be placed in the defendant's presence. The receipt is actually consistent with the State's timeline, [as] there is no argument by the State that the victim was not alive at 8:24 p.m." The circuit court therefore did not find Lopez "ineffective for [not] introducing the receipt at trial."

¶ 44    "As an additional consideration" the circuit court found that Macias' testimony was "not definitive," despite noting that Macias believed that the cash register that produced the receipt functioned properly on December 27, 2000, and that the receipt was accurate. The circuit court noted that a separate company maintained the cash register, Macias was not working on December 27, 2000, and she "could not definitively say" that the cash register was operating properly that day.

¶ 45    In sum, the circuit court concluded that "after conducting evidentiary hearing and having had the opportunity to observe and assess the credibility of the witnesses presented by [defendant]

I do not find that [defendant] has met [his] burden. I find that [defendant] had failed to show that trial counsel was ineffective."

¶ 46    Defendant thereafter timely filed the present appeal. On appeal, defendant contended that the circuit court improperly refused to admit certain evidence at the evidentiary hearing on his postconviction petitions, and ultimately incorrectly denied his postconviction claims of ineffective assistance of trial counsel.

¶ 47    In a prior order issued in this appeal, this court ruled that defendant had failed to show that the circuit court abused its discretion in refusing to admit Valdez's proposed testimony. *Martinez*, 2019 IL App (1st) 171533-U, ¶ 70. However, we also concluded that the circuit court made two evidentiary errors at the evidentiary hearing. *Id.*, ¶¶ 67, 75. Specifically, we concluded that the circuit court improperly refused to allow defendant to present the testimony of Pablo and improperly refused defendant's request to take judicial notice of the of the shortest driving distance between Reyes' house and the Aguascalientes restaurant, from the restaurant to the entrance to the forest preserve, and from the forest preserve entrance to Pablo and Maritza's home, as reflected in the 2016 Google Maps printouts proffered by defendant. *Id.* We therefore remanded with directions that the court reopen the evidentiary hearing so that it could consider additional evidence. *Id.* ¶ 98. This court retained jurisdiction to consider, if necessary, defendant's primary contention that he established a denial of his right to effective assistance of trial counsel. *Id.* ¶ 99.

¶ 48    At the supplemental hearing held upon remand, Pablo testified through an interpreter that that he has two stepsons, Giovanni and defendant. Pablo testified that he had not seen defendant since December 2000, and had no contact with him since his arrest in 2001. Pablo said that he and defendant did not have a "good relationship" before defendant's arrest and they "argue[d] because of [defendant's] lifestyle."

¶ 49    In December 2000, Pablo was not working because the factory where he worked would close in December. Pablo specifically remembered that on the evening of December 27, 2000, he was at home along with Giovanni's girlfriend, Veronica, and her daughter, who had come to visit from Puerto Rico for the first time. A friend of defendant's arrived, and Pablo argued with defendant because he did not want defendant's friends in his home. Pablo told them to leave and they did.

¶ 50    Later that night, when Pablo was brushing his teeth and getting ready to go to bed, defendant returned to Pablo's house. Pablo testified that it was about 9:00 p.m. because that was when he usually went to bed and because he noticed the clock in his room "more or less" reflected that time. Nevertheless, Pablo acknowledged that he did not mention a clock in his 2016 affidavit.

¶ 51    Pablo never attended any of defendant's trial proceedings. He was not subpoenaed to testify and never spoke with an attorney for defendant. Pablo never met with Lopez or anyone who worked for Lopez, nor did his wife ever ask him to do so.

¶ 52    With respect to Pablo's 2016 Spanish-language affidavit, a new English translation was completed at the time of the supplementary evidentiary hearing due to the unavailability of the prior interpreter to prove-up the original translation. The report of proceedings of the hearing indicates that the original Spanish affidavit and the new English translation were entered into evidence as exhibits by defendant following Pablo's testimony. However, neither of those exhibits has been included in the record on appeal. The only copy of the Spanish affidavit and the only English-language translation thereof contained in the record is the affidavit and original translation that was attached to the second supplemental petition filed in 2016. *Supra* ¶¶ 26-27.

¶ 53    The circuit court then took judicial notice of defendant's 2016 Google Maps evidence, noting its understanding that this court's prior order had relegated any concerns about its reliability

to an issue of the weight to give that evidence rather than one of admissibility. The State recalled Lopez, who testified that he did not recall if Pablo attended any proceedings, but he was introduced to Pablo and neither Maritza nor defendant ever mentioned him as a potential alibi witness.

¶ 54 On September 4, 2020, the circuit court issued a written order denying defendant postconviction relief. Therein, the circuit court began by noting that at the end of defendant's bench trial, the trial judge found Reyes to be a "credible witness" after having reviewed his " 'testimony, his actions on the stand, the way he testified.' " The trial judge also found Reyes' testimony corroborated in that defendant had the victim's phone and made conflicting statements to police at the time of his arrest. The circuit court found "no question" that the trial judge was "in the best position to evaluate" the witnesses' credibility, and determine what weight to give the evidence presented, to decide "whether the State met the burden of proof beyond a reasonable doubt."

¶ 55 The circuit court then went on to reiterate its prior finding that Narbaiz was an incredible witness, thus making Lopez's failure to call her as a witness not unreasonable. As to the receipt, the circuit court found that it was not entitled to much weight in light of Macias' lack of any first-hand knowledge regarding when and under what circumstances it was printed. The circuit court also found that the receipt actually fit within the State's timeline.

¶ 56 Ultimately, the circuit court concluded that there were credibility concerns with respect to Pablo and Maritza. In addition, it concluded that Lopez's decision not to present any evidence that defendant was home with them at 9:00 p.m. on December 27, 2000 was justified by both those credibility concerns and—in light of defendant's confession—Lopez's ethical obligation not to present knowingly false testimony.

¶ 57    This matter now returns to this court following the supplemental evidentiary proceedings and the filing of additional briefing. The parties also rely upon the arguments contained in the original briefs filed prior to our remand for further evidentiary proceedings.

¶ 58    As noted above, defendant filed the instant petitions pursuant to the Act. "The Post–Conviction Hearing Act *** provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. [Citations.] A postconviction action is not an appeal from the judgment of conviction, but is a collateral attack on the trial court proceedings." *People v. Tate*, 2012 IL 112214, ¶ 8. A postconviction proceeding contains three stages, the third stage of which is an evidentiary hearing. *Id.* at ¶ 9. At a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 59    The circuit court, serving as the finder of fact at the third stage, must determine witness credibility, weigh the testimony and evidence, and resolve any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34, "Following a third-stage evidentiary hearing where fact-finding and credibility determinations are made, the circuit court's decision will not be reversed unless it is manifestly erroneous." *People v. Logan*, 2011 IL App (1st) 093582, ¶ 30. "Manifest error is error that is 'clearly evident, plain and indisputable.' " *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). This deferential standard of review reflects the understanding that the circuit court is in the best position to observe and weigh the credibility of the witnesses. *People v. Coleman*, 183 Ill. 2d 366, 384–85 (1998).

¶ 60    All the claims raised in defendant's petitions involve allegations that he received ineffective assistance of trial counsel. A claim of ineffective assistance of counsel is judged according to the

two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Lawton*, 212 Ill. 2d 285, 302 (2004). In order to obtain relief under *Strickland*, a defendant must prove defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance caused defendant prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different. *People v. Wheeler*, 401 Ill. App. 3d 304, 313 (2010). The defendant must establish both prongs of this two-part test (*People v. Edwards*, 195 Ill. 2d 142, 163 (2001)), and the defendant bears the burden of demonstrating he received ineffective assistance of counsel (*People v. Valladares*, 2013 IL App (1st) 112010, ¶ 52). If either prong of the *Strickland* test cannot be shown, then the defendant has not established ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 61    Effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Thus, a petitioner must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010). "Decisions involving what evidence to present and which witnesses to call fall within the broad category of trial strategy and are not subject to a claim of ineffective assistance unless they deprive a defendant of a meaningful adversary proceeding." *People v. Smith*, 2012 IL App (1st) 102354, ¶ 86 (citing *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005)).

¶ 62    Furthermore, it is well settled "that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). A mistake in trial strategy or an error in judgment will not render representation constitutionally defective. *Id*. at 355-356. "Only if counsel's trial strategy is so unsound that he

entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.*

¶ 63 Before proceeding to defendant's specific assertions of error, we address two of defendant's overarching arguments. First, we reject defendant's contention that this court has already "adjudicated prejudice" with respect to the failure to introduce the receipt into evidence at trial, concluded that the Google Maps evidence "alone" supported his claim of ineffective assistance of counsel, and "previously ruled that if Mr. Martinez could prove up the driving distances and times as alleged, then defense counsel's performance was constitutionally deficient and prejudicial for failing to present evidence showing the impossibility of the prosecution's theorized timeline for the murder." This court has made no such conclusions, and defendant's citations to our prior decisions provide no support for defendant's assertions otherwise.

¶ 64 Defendant first cites to the first paragraph of our 2014 decision for the proposition that we have already concluded that the contents of the receipt *alone* undermine the State's timeline and render it "improbable." However, what we stated therein—a paragraph that served merely as a summary of our holding in that order—is as follows:

> "Dismissal of defendant's postconviction petitions at the second stage reversed where there was a substantial showing of ineffective assistance of trial counsel based on the cumulative effects of counsel's failures to interview and call witnesses to impeach the credibility of a key witness, and to seek the admission of the contents of a restaurant receipt into evidence and testimony of witness, which would show a timeline making it improbable defendant committed the murder." *Martinez*, 2014 IL App (1st) 112794-U, ¶ 1.

Clearly, in that paragraph we were merely summarizing our finding that defendant had made a "substantial showing" of ineffective assistance of counsel at the second-stage of proceedings, not

that he had met his third-stage burden to establish ineffective assistance of counsel. The quoted language also clearly indicates that we only reached that conclusion after considering "the cumulative effects of counsel's failures." *Id*. This point is only made clearer by citation to paragraph 47 of that order, in which we specifically concluded "based on the record before us and *taking defendant's well-pleaded facts and accompanying affidavits as true*, we hold that defendant has made a *substantial showing* of ineffective assistance of trial counsel based on the *cumulative failure* to investigate the testimony of witnesses Rachel Narbaiz, Diana Mercado, and Maritza Amaya and to introduce the receipt from Aguascalientes restaurant as substantive evidence." (Emphasis added.) *Id*. ¶47.

¶ 65    Nor does any language in our 2019 decision support defendant's assertion that we have already concluded that the Google Maps evidence alone established "sufficient prejudice" to warrant postconviction relief. Defendant cites to paragraph 89 of that order, and therein we did state that it was "clear that defendant was prejudiced by not being able to cite to the 2.1 mile driving distance between Mr. Reyes' home and the restaurant in attacking the State's timeline" (*Martinez*, 2019 IL App (1st) 171533-U, ¶ 89). However, in identifying the prejudice we merely stated that this evidence "could" have supported defendant's claim of ineffective assistance of counsel. *Id*.

¶ 66    Defendant's citation to the following paragraph of the 2019 order is similarly unavailing. There, we merely concluded that the remainder of the Google Maps evidence "*could* provide further evidence to question" Lopez's performance at trial. (Emphasis added.) *Id*. ¶ 90. We also explicitly stated that the remainder of the Google Maps evidence could only support defendant's argument if the circuit court also allowed Pablo to testify and credited his testimony. *Id*. Any remaining doubt as to whether we have already adjudicated the import of the Goggle Maps

- 23 -

evidence can be laid to rest by our prior instruction that, upon remand, the circuit court should take judicial notice of the distances contained therein and "consider[] the impact of that evidence" (*id.* ¶ 97) and our prior choice not to reach the ultimate question of whether defendant had established ineffective assistance of counsel (*id.* ¶ 98).

¶ 67    Second, we reject defendant's general contention that he was prejudiced simply by Lopez's failure to present evidence of the receipt or the testimony of Narbaiz, where Lopez "promised" to do so in his opening statement at trial. As an initial matter, the record reflects that while Lopez mentioned both the receipt and Narbaiz in his opening statement, he made no explicit "promise" to produce any evidence related to either the receipt or Narbaiz at trial.

¶ 68    More importantly, each of the cases cited by defendant in support of his contention that he was prejudiced by any possible failure to produce evidence "promised" during an opening statement involved such promises made in the context of a jury trial. *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 1; *People v. Bryant*, 391 Ill. App. 3d 228 (2009); *People v. Ligon*, 365 Ill. App. 3d 109, 111 (2006); *People v. Ortiz*, 224 Ill. App. 3d 1065 (1992); *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003); *Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002); *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990); *Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1988). In contrast, here defendant was convicted following a bench trial. "In a bench trial, it is presumed the trial judge considered only competent evidence in reaching a verdict." *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 14. The presumption may be rebutted only where the record affirmatively demonstrates the contrary. *Id.* Here, defendant fails to direct us to anything in the record reflecting that any failure to present evidence referenced during Lopez's opening statement prejudiced the trial court's analysis of the evidence that was presented at his trial. We therefore find nothing in the record to rebut the presumption that the trial judge only considered competent evidence in

finding defendant guilty.

¶ 69    We now turn to defendant's first specific assertion of error, that the circuit court erred by not finding that Lopez's failure to interview Narbaiz and to present her testimony at trial amounted to ineffective assistance of counsel.

¶ 70    We initially reject defendant's argument to the extent that it relies upon Narbaiz's testimony that Lopez never interviewed her. Lopez testified that he had in fact interviewed her prior to trial. While defendant notes that Lopez could not remember exactly when the interview took place or what Narbaiz looked like, we note that Narbaiz was likewise unable to remember many details about executing her affidavit in support of defendant's petition. She also denied ever speaking to investigators in 2002, when there was documentary evidence that she had done so.

¶ 71    Generally, "a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48. Nevertheless, "[a]lthough a fact-finder's determination of witness credibility is entitled to great deference, it is not conclusive and does not bind the reviewing court." *People v. Gray*, 2017 IL 120958, ¶ 35. Here, it was for the circuit court to determine issues of credibility and resolve evidentiary conflicts, and the circuit court specifically found that Lopez "was very credible" when he said he did interview Narbaiz. We find no basis to overturn the circuit court's conclusion.

¶ 72    We also reject defendant's contention that Lopez's decision not to present Narbaiz's testimony at trial could not have been strategic. Defendant claims any assertion that credibility concerns led to this decision ring hollow due to: (1) the "promise" to call Narbaiz made in Lopez's opening statement, a promise made after Lopez was already aware of any credibility concerns, and (2) Lopez's testimony at the evidentiary hearing that he would "never call" Narbaiz as a witness

at trial, even though he promised to do so in his opening statement.

¶ 73    These arguments misread the record. As discussed above, Lopez mentioned Narbaiz in his opening statement, he did not promise to present her testimony. Moreover, it is not at all clear that Lopez testified that he would "never call" Narbaiz as a witness. Rather, the record appears to reflect that, in the context of denying that defendant gave him Narbaiz's contact information during trial to counter Reyes' testimony, Lopez indicated that he would "never call" her on the phone. Thus, this exchange does not appear to have the definitive import defendant's argument on appeal would suggest.

¶ 74    In the end, the circuit court accepted Lopez's assertion that he decided not to have Narbaiz testify at trial because the presence of defendant's brother when Narbaiz was interviewed by investigators in 2002 made her denials regarding defendant's purported statements to her and Reyes "look[] kind of staged." The record reflects that Narbaiz and defendant's brother have a long-term relationship, and he is the father of one of her children. In addition, with respect to Narbaiz, the circuit court found her to have a "very selective memory" and to have a "very questionable memory" with respect to the execution of her affidavit. Considering all this evidence, the circuit court concluded that Lopez's decision not to call her at trial was "a sound decision due to serious credibility concerns that [Narbaiz] posed." On this record, we cannot say that this conclusion was manifestly erroneous, particularly where decisions involving which witnesses to call fall within the broad category of trial strategy and are not subject to a claim of ineffective assistance unless they deprive a defendant of a meaningful adversary proceeding. *Smith*, 2012 IL App (1st) 102354, ¶ 86.

¶ 75    Defendant's second specific contention is that he was prejudiced by Lopez's failure to interview Pablo or Maritza and present testimony at trial that defendant was home with them at 9

p.m. on December 27, 2000. The parties vigorously dispute whether Lopez's conduct in this regard fell below an objective standard of reasonableness, particularly with respect to the question of whether Lopez was ethically precluded from presenting such evidence due to defendant's disputed admission to Lopez that he committed the murder. We need not consider that issue. Regardless of the resolution of the first prong of the *Strickland* test as to the failure to present this evidence, defendant has not met his burden to establish a reasonable probability that, but for the failure to present this testimony, the trial result would have been different. *Wheeler*, 401 Ill. App. 3d at 313; *Edwards*, 195 Ill. 2d at 163.

¶ 76    The circuit court resolved this issue, in part, by concluding that there were significant credibility concerns with respect to the testimony of Pablo and Maritza. The evidence upon which the circuit made this determination included the new English translation of Pablo's affidavit that was introduced by defendant as an exhibit at the supplementary evidentiary hearing, but which has not been included in the record on appeal. As the appellant, it was defendant's burden to provide a sufficiently complete record on appeal so that this court can be fully informed about the issues. *People v. Moore*, 377 Ill. App. 3d 294, 300 (2007). Absent a complete record, we must presume the trial court's judgment conforms to the law and has a sufficient factual basis. *Id*. Any doubts arising from the incomplete record will be resolved against defendant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). To the extent that we have any doubts as to what the content of the new translation added or subtracted from the trial court's credibility determination, those doubts must be resolved against defendant.

¶ 77    Nevertheless, there is nothing in the record to indicate that the new translation differed in any material way from the original translation that has been included in the record. Even

considering that translation of Pablo's affidavit, however, the circuit court did not err in rejecting his claim of prejudice.

¶ 78     Both Pablo and Maritza testified that defendant was home with them at 9 p.m. on December 27, 2000, because at the time defendant came home Pablo was brushing his teeth and getting ready for bed, and it was his custom in December 2000 to do so at 9:00 p.m. Pablo also testified that a clock in his room read "more or less" 9:00 p.m. at that time.

¶ 79     However, Maritza's 2010 affidavit included no indication as to how Maritza was aware of the timing of defendant's arrival. She only included the detail about Pablo getting ready for bed and brushing his teeth in her subsequent 2016 testimony. And Pablo's 2016 affidavit—executed before Maritza's testimony—included nothing about him brushing his teeth or that he had looked at a clock that read "more or less" 9:00 p.m. when defendant came home. These details appeared for the first time in his 2020 testimony. Moreover, the claim that Pablo customarily went to bed at 9:00 p.m. in December 2000 is at best difficult to reconcile with Pablo's affidavit, in which he averred: (1) that while this was his custom when he worked first-shift, he had already begun working second shift by December 27, 2000, and (2) in any case, he was not working that week because the factory was closed.

¶ 80     Considering the evolving nature of Pablo and Maritza's assertions regarding December 27, 2000, the inconsistencies between their testimony and the assertions in Pablo's affidavit, and the circuit court's conclusion that there were credibility concerns with respect to Pablo and Maritza's testimony at the hearings, it was not manifestly erroneous for the circuit court to find the basis for defendant's claim that he returned to his parents' home at 9.p.m. "implausible." As such, defendant has not met his burden to establish prejudice by creating a reasonable probability that, but for the presentation of this testimony, the trial result would have been different.

¶ 81 Defendant's final argument is that the circuit court improperly rejected his claim that Lopez's failure to introduce the restaurant receipt as substantive evidence, combined with the Google Maps evidence, amounted to ineffective assistance of counsel. Defendant's argument contends that the receipt and the Google Maps evidence establish that the State's timeline required defendant to call Reyes at 7:32 p.m. on December 27, 2000, arrive with Sanchez at Reyes' residence approximately 20-30 minutes later to obtain a gun, drive 2.1 miles—or a 10-13 minute drive—to the restaurant and complete a meal with Sanchez at the restaurant before the receipt was printed at 8:24 p.m. Defendant contends that the circuit court incorrectly rejected his claim that the receipt and the Google Maps evidence thus render "the State's own timeline of guilt improbable to an extent that, at a bare minimum, undermines confidence in the outcome" of his trial.

¶ 82 We disagree, even if Lopez's conduct in this regard fell below an objective standard of reasonableness. Once again, we conclude that the circuit court did not manifestly err in finding that defendant has not met his burden to establish prejudice by creating a reasonable probability that, but for the presentation of this testimony, the trial result would have been different.

¶ 83 With respect to the receipt itself, upon remand the circuit court correctly recognized that while we previously concluded that defendant had sufficiently established that the receipt was subject to being substantively admissible at defendant's trial, the weight to afford that evidence remained an open question. *Martinez*, 2019 IL App (1st) 171533-U, ¶¶ 93-95. In denying defendant postconviction relief, the circuit court noted that defendant had called Macias to testify that receipts from the Aguascalientes restaurant were "typically printed at the end of the meal. However, [she] could provide no information as to when or how this actual receipt was printed." The record supports the circuit court's concerns as to the weight to give the receipt, where Macias' affidavit only indicated that receipts were "usually" printed at the end of a meal and her hearing

testimony clearly showed that she did not know if she was working on the date in question and had no independent, first-hand knowledge as to when and under what circumstances the receipt was printed. As such, we cannot say that the circuit court's determination to imbue the receipt with little weight or significance was manifestly erroneous.

¶ 84    As to the 2016 Google Maps evidence regarding the distance and travel time between Reyes' residence and the restaurant, the circuit court once again recognized that while we had previously faulted the circuit court for not taking judicial notice of this evidence, we also left the weight and significance to afford that evidence an open question to be resolved upon remand. *Id.* ¶¶ 75, 97. In admitting this evidence, the circuit court reiterated its concerns about the lack of evidence that the road conditions and driving times in 2016 were consistent with those at the time of defendant's trial in 2003. Then, in its written order the court noted that the 8:24 p.m. receipt from the restaurant could actually support the State's timeline, where the State only argued that defendant obtained the gun from Reyes as early as 7:52 p.m. and did not call Reyes to tell him Sanchez was dead until 9:42 p.m.

¶ 85    In addition, the circuit court's order also highlighted the fact that the original trial judge had found Reyes a credible witness, and that his trial testimony was corroborated by the fact that defendant was in possession of Sanchez's phone and had given conflicting, untrue stories about where he had dropped Sanchez off on the night of December 27, 2000. While defendant instead contends that Reyes' trial testimony was "uncorroborated by any physical evidence or additional witnesses in support," the circuit court correctly recognized that is simply incorrect. *Supra* ¶ 16.

¶ 86    Considering all these factors, the circuit court rejected defendant's contention that Lopez's failure to introduce the restaurant receipt found in Sanchez's pocket as substantive evidence, combined with the Google Maps evidence, so prejudiced defendant that there is a reasonable

probability that, but for the presentation of this testimony, the trial result would have been different. On this record, we cannot conclude that this finding included any error that is so clearly evident, plain and indisputable that reversal is warranted.

¶ 87    In reaching this conclusion, we note that defendant also faults the circuit court for concluding that the failure to introduce the receipt was not prejudicial because Macias provided no information as to whether the order reflected on the receipt was "a carryout/fast food meal or a sit-down meal," an assertion the State raised in its closing argument at the supplementary evidentiary hearing. Because we conclude that the circuit court did not commit manifest error in light of the other evidence and factors considered, we need not consider whether the circuit court erred in relying upon this possibility. *In re Jonathan P*., 399 Ill. App.3d 396, 400 (2010) ("Generally, courts of review do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided.").

¶ 88    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 89    Affirmed.